## Commonwealth v. Kolsky et al.

*Charles F. Kelley*, Assistant District Attorney, for Commonwealth.
*Morris Wolf* and *David S. Malis*, for defendant.

LEWIS, J., Aug. 2, 1930.—The defendant, Louis Kolsky, was indicted with four others on a charge of conspiracy. The first of the two counts of the bill charged that the defendant with the others conspired, by false and fraudulent representation, to cheat and defraud the Denckla Building and Loan Association of $10,000 in a transaction whereby the association was led to make a second mortgage loan in that sum on a garage property located in the City of Philadelphia. The second count was a general charge of conspiracy to cheat and defraud the building and loan association of $10,000 in connection with the garage transaction.

At the conclusion of the presentation of the Commonwealth's evidence, defendant's counsel entered a demurrer, and we have had before us, therefore, since the day of trial a plain question of law. Our duty in the premises is succinctly defined by the Superior Court in Com. *v.* Williams, 71 Pa. Superior Ct. 311, as follows:

"In criminal cases demurrer to the evidence of the Commonwealth admits all the facts which the evidence tends to prove and all inferences reasonably deducible therefrom: Com. *v.* Parr, 5 W. & S. 345; Golden *v.* Knowles, 120 Mass. 336; Wharton's Crim. Ev., § 616; McKowen *v.* McDonald, 43 Pa. 441. The court in such case is not the trier of the facts. The admissions implied in the demurrer leave for consideration the single inquiry whether the evidence

introduced presents such a state of facts, with the inferences fairly arising therefrom, as would support a verdict of guilty."

And in the later case of Com. v. Smith, 97 Pa. Superior Ct. 157, where it is additionally said:

"On a demurrer to the evidence, every fact which the jury could infer in favor of the party offering it from the evidence demurred to is to be considered as admitted."

We have sought, therefore, by most careful reading and re-reading of the testimony and the briefs of able counsel to determine what facts and possible inferences favorable to the Commonwealth are disclosed by the record.

We must bear in mind that "when a crime charged is sought to be sustained wholly by circumstantial evidence, the hypothesis of guilt or delinquency should flow naturally from the facts and circumstances proved, and be consistent with them all." And that "the evidence of facts and circumstances must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed, or, in other words, the facts and circumstances cannot only all be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence:" Com. v. Byers, 45 Pa. Superior Ct. 37.

We must have regard, also, as we are reminded in this last cited case, to the fact that there is a presumption of innocence and that it is "our duty to determine as a matter of law whether the proof has been sufficient in volume and quality to overcome that presumption;" and that "in favor of the liberty of the citizen the court may, and in a proper case should, declare the evidence insufficient to convict."

In analyzing the testimony, we have had no difficulty in concluding that there was not sufficient proof to establish the guilt of the defendant of a conspiracy to make a false pretense and representation with regard to the circumstances under which the Hubert Building and Loan Association granted a mortgage loan on the garage building and then failed to consummate the transaction. Hence, that portion of the first count of the conspiracy indictment may be disregarded.

The remainder of the first count is to the effect that the defendant and others conspired to cheat and defraud the Denckla Association of $10,000 by falsely and fraudulently representing, both prior to and at the time of settlement, March 5, 1926, that the garage property on which the second mortgage loan was to be made was being purchased by Silverman and Mahoney for a price or consideration of $72,000, $17,000 of which was to be, or was being, paid in cash, including $8000 already alleged to have been deposited as down money—in brief, that the buyers of the garage property were contributing as an equity over and above the mortgages $17,000 in cash to complete the purchase price.

No evidence appears to question the payment by the purchasers of the $8000 alleged deposit in cash; the controversy relates entirely to an additional sum somewhat in excess of $10,000 required to make up the balance of the $17,000 and the settlement charges.

The evidence was ample to justify the jury in finding as facts that the representation was made by Satz and Yaskin, two of the co-defendants; that the purpose of the representation was to induce the Denckla Association to make the second mortgage loan of $10,000; that the association relied upon the representation in agreeing to make the loan; that a settlement hour was fixed on March 1, 1926, at which time the association was not prepared to complete the transaction and a further meeting was arranged for March 5, 1926, in

the settlement rooms of the Peoples Bank and Trust Company of Philadelphia; and on that day all of the defendants were present in person around the settlement table, together with the conveyancer and another representative of the Denckla Association; that Kolsky and Company, in which the defendant, Kolsky, was substantially interested as co-owner and manager, was virtually the real owner of the garage property, title to which was held in the name of Kolsky and Company's straw-representative, Ida Abramson; that Silverman, one of the supposed purchasers of the garage property, signed a check in blank and handed it to Kolsky, who filled in the check for an amount approximating $10,000, representing the balance of the purchase price payable by the buyers, and that Kolsky then handed this check to Mercer, the settlement clerk; that thereupon a settlement sheet was made up by Mercer containing an entry of a credit to the buyers for a payment corresponding to the balance shown to be due by them to complete the settlement, and distribution checks were drawn, or at least some of them were, and two checks were delivered to the representatives of the Denckla Association, who thereupon left the settlement room; that at this moment of time there remained around the settlement table the settlement clerk, Mercer, Kolsky, Yaskin and Satz, the supposed actual vendors, and Silverman, one of the supposed buyers; that at some time subsequent to the departure of the loan association's representatives, the settlement sheet figures were changed, so that instead of there being exhibited thereon an entry representing actual payment by the buyers of this balance of purchase price and expenses in excess of $10,000, a "credit," without explanation or detail, was given to the buyers in the exact sum necessary to make up the settlement funds, and Silverman's check was not retained by the settlement clerk and did not pass through the Peoples Bank and Trust Company as part of the settlement transaction; that Kolsky and Company obtained, directly or indirectly, a substantial part of the money passing at the settlement after the deduction of the customary charges and disbursements; that the transaction was finally recorded on a settlement sheet of the trust company and on its records as including no payment in cash to the trust company as settlement agent on the part of the purchasers, Silverman and Mahoney, "credits" being given to them not only for $8000 down money as having already been paid and for the $10,810.69 additional required, but a further unexplained "credit" of $5750. The settlement clerk testified, and it is not disputed, that the only cash that did pass through the trust company as settlement agent was $10,000 paid by the Denckla Association to complete its mortgage loan and $1759.95 deposited by Kolsky and Company as agents for the new first mortgagee to complete the fund of $45,000 to be secured by a first mortgage. The jury could clearly find that of this $11,759.95 so paid in, $4750 was disbursed to Abe Kolsky and Company for services, apparently commissions, and $788 for fire insurance, and the net balance remaining after all charges, $3089.95, was represented by a settlement check payable to Ida Abramson, which was found to have been endorsed by her and to have been deposited to the credit of Kolsky and Company's bank account.

Notwithstanding the foregoing, no direct evidence appears that the defendant, Kolsky, conspired or agreed with the others to make any false representation to the building and loan association with regard to the purchase price or to the character of payments. The Commonwealth asserts that it has proved the overt act—a false and fraudulent representation by Satz and Yaskin, relied upon by the victim, and the beneficiaries of which were Kolsky and his co-defendants. The district attorney contends the facts raise an inference of an unlawful concert or conspiracy by the participants. The Commonwealth

argues that a false credit was given to the supposed buyers; that the use of Silverman's check, filled in by Kolsky and delivered to Mercer, was a trick which kept alive and renewed the false pretense and was calculated to and did lead the loan association to fall a victim to the conspiracy to cheat and defraud it; that Kolsky was the chief beneficiary; that all this was not possible without Kolsky's knowledge and consent, and that he, therefore, must have been a party to the fraud.

It is conceded, however, the real proof of conspiracy as to Kolsky depends upon whether a false representation has been proven. The gist of the entire case will be found, therefore, in the question: "The evidence being sufficient to show a representation that the purchasers were paying $72,000 for the property, of which $17,000 was being paid in cash, could the jury from the evidence before it lawfully find that the sum of $17,000 was not paid in cash?"

No direct evidence was offered to the effect that the purchasers did not pay to the sellers the $17,000 in cash; that is, no one in a position to know testified that it was not paid except the settlement clerk, Mercer, who (page 84, notes of testimony) was examined and answered as follows:

"By Mr. Kelley: How much money was actually put up to make this settlement? A. $11,759.95. Q. And who put up that $11,759.95? A. That was in two items, one an item of $10,000 from the Denckla Building and Loan Association, and an item of $1759.95 from the Tri-County Building and Loan Association. Q. And that is all the money that was put up to make this settlement? A. Yes, sir. Q. That's all."

That is direct evidence of the most positive character that the $17,000 was not paid in cash at and as part of the settlement. Is this sufficient proof of non-payment in a criminal prosecution? Must not the possibility of payment outside of the settlement routine be negatived by the Commonwealth, especially in view of the fact that the credit for apparent payment was allowed by the sellers, and this may be said to constitute *prima facie* evidence of payment? There is no evidence of any kind as to what disposition was made of the Silverman check alleged to have been handed to Mercer, which Mercer denied having received; nor is there any direct evidence that Kolsky remained in the settlement room during the time when any arrangement was made for the return or destruction of the check, nor during the time when the settlement sheet was altered and the credit given the purchasers in lieu of cash.

Hence, the evidence relied upon by the Commonwealth to sustain a conviction of the defendant on the conspiracy charge is purely circumstantial; first, that no money passed from buyers to sellers as part of the settlement, where it would ordinarily have been paid; that Kolsky "filled in" the check; that Kolsky remained in the settlement room when the representatives of the building and loan association departed after seeing the check delivered to Mercer and after having examined Mercer's settlement sheet; that the disposition of the check is not accounted for; that Kolsky, through his part ownership of Abe Kolsky and Company, was the recipient of the larger part of the money obtained from the Denckla Association, in the guise of commissions, credits for services, or as the principal of Ida Abramson, the straw-woman; that Kolsky was the dominant factor in the entire transaction of financing the garage property and wrote a letter of instruction to the trust company which evidences his complete control of the settlement; that the trust company could not have allowed the "credit" to the buyers without authority from the sellers, and Kolsky controlled and acted for Ida Abramson, who held title, and Kolsky must, therefore, have been the one to give consent to the withdrawal of the

check and to the allowance of the credit in lieu of money, and this happened after the association's conveyancer had left the settlement room.

The Commonwealth's case is strong, but being circumstantial, to justify conviction, the "evidence as to the fact of a crime committed, and its author, should be such as to exclude all rational theories but that the crime existed and the accused was its author:" Com. *v.* Exler, 61 Pa. Superior Ct. 423.

As we have said, also, the evidence of facts and circumstances "must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed:" Com. *v.* Byers, *supra,* Com. *v.* Bone, 64 Pa. Superior Ct. 44.

We have taken great care to be sure that our conclusion in this case should be legally the right one. We have had great difficulty in excluding from our mind assertions which were presented to us at the trial informally and are, hence, not upon the record and form no proper part of the case. We think it extremely unlikely that the transaction was *bona fide;* our own opinion is quite strong that Silverman and Mahoney did not pay the $8000 down money nor the $10,810.69 balance of the purchase money either in cash or in property or in any other thing of value. We are strongly convinced by the circumstances that the check signed by Silverman and alleged to have been filled in by Kolsky was later withdrawn from the settlement clerk and destroyed with the consent of Kolsky. But the defendant is not to be convicted upon the opinion of the trial judge, not based entirely upon evidence duly presented, nor upon probabilities where the evidence relied upon consists of a chain of events entirely circumstantial.

To find the defendant guilty, we must first conclude a false representation has been proved—*i. e.,* that the evidence establishes that the $17,000 was not paid by Silverman and Mahoney and excludes any hypothesis that it was paid. This conclusion we cannot lawfully and conscientiously reach from the evidence. It is true the evidence is amply sufficient to justify a jury in concluding that the balance of the purchase money was not paid either in cash or in any other form through the title company at the time and place fixed for the settlement; but conceivably may the check not have been deposited and collected by Ida Abramson apart from the settlement? The weak link in the Commonwealth's chain is the very failure to account for the disposition of the check. May it not be that for purposes of their own the parties elected not to pass the money represented by the checks through the trust company's books? It is conceivable, when regard is had only to the record, that if we should overrule the demurrer and adjudge this defendant guilty, evidence might be forthcoming from the missing witness, Abramson, and from Silverman to establish that, apart from the trust company, the check as drawn was paid or that money was substituted for the check, and that, hence, the credit was not a trick or subterfuge, but represented money eventually received. In other words, the Commonwealth has failed to exclude the hypothesis that payment may have been made despite the strongly suspicious circumstances surrounding the transactions at the Peoples Bank and Trust Company. Silverman was not called as a witness, and neither he nor any one else gave evidence that the check was not paid; the Commonwealth endeavored to locate Ida Abramson, presumably to have her testify that the consideration was not received either in cash or otherwise, but she was not to be found. Regardless of whatever reluctance we may feel, the evidence being circumstantial and being consistent with the hypothesis of innocence of participation in any conspiracy to cheat and defraud by false representation, the demurrer must be sustained and the defendant discharged without day, and we so order.

From our decision the Commonwealth may appeal, and if we have erred the error will be corrected by the Superior Court. We are not now disposing of the motions for a new trial filed on behalf of Satz and Yaskin, for the reason that one question there involved is identical with that which we have herein discussed, and we will await the judgment of the appellate court.