## Commonwealth v. Pogach, Appellant.

Argued May 6, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-
FELD, PARKER, JAMES and RHODES, JJ.

*B. D. Oliensis,* for appellant.

*Frederick B. Smillie,* Assistant District Attorney,
with him, *Stewart Nase,* District Attorney, for appellee.

OPINION BY CUNNINGHAM, J., July 18, 1935:

Hyman Pogach was convicted in the court below
under an indictment drawn in the language of Section
4 of the Act of April 25, 1929, P. L. 767, 18 PS §3024,
the applicable portion of which reads: "Any person
who, wilfully and with intent to injure or defraud the
insurer, sets fire to, or burns, or causes to be burned,
...... any goods, wares, merchandise, or other chat-
tels, or personal property of any kind, whether the
property of himself or of another, which shall, at the
time, be insured by any person or corporation against
loss or damage by fire, shall be guilty of a felony" etc.
This appeal is from the judgment of sentence pro-
nounced upon the verdict; it included imprisonment
for not less than three, nor more than six, years in the
Montgomery County prison.

A careful reading of the testimony demonstrates that there is but little conflict in the material portions thereof. The question of law with which we are concerned upon this appeal is whether the evidence was sufficient in volume and quality to overcome the presumption of innocence. Appellant's twenty-fifth point read: "Under all the evidence in this case your verdict must be not guilty." The refusal of that point by the trial judge forms the basis of the third assignment of error.

The personal property involved in this case consisted of a stock of clothing, dresses, coats and similar outfitting merchandise, together with certain fixtures, in a storeroom at No. 211 West Main Street, Lansdale, of which appellant and his brother were the lessees, along with the basement underneath. The business was conducted under the name of Philadelphia Bargain House. A fire, which materially damaged the stock and fixtures, started in the central part of the storeroom about 7:30 o'clock on Saturday morning, February 24, 1934, during the absence of the proprietors. Upon that date, they were carrying $15,000 insurance, of which $2,000 was upon the fixtures and the remainder upon the merchandise. There was no direct evidence that appellant wilfully set fire to the merchandise or caused it to be burned. He earnestly denied all responsibility.

The circumstances surrounding the fire, as shown by the evidence, may be thus summarized: Appellant lived in Philadelphia and usually returned to his home each night, but, as it was his practice to keep the store open late Friday night and begin business early on Saturday morning, it had become his custom, during the eighteen months he occupied this storeroom, to sleep in the store each Friday night.

On the night of February 23, 1934, appellant closed the store about ten o'clock and went to a room above it, occupied by an Eagles' Lodge, where he remained with friends until one o'clock the next morning and then

went with George W. Smith and two other friends to Smith's home to play cards. About four o'clock appellant left his friends, went to the store and slept in a makeshift bed in one of the bins until six-thirty.

Heat for the storeroom was supplied through a single register in the floor about thirty feet from the front door. Directly underneath the register was a Thatcher warm air, pipeless, heater and over it, and crosswise with the room, was placed a table, upon which inflammable merchandise was piled; goods were also kept upon a shelf underneath the top of the table. Appellant testified he arose about 6:30 on the morning of the fire, went to the cellar, found the fire in the heater had gone out, started a fresh fire therein, locked the front door of his store and, following his usual routine, went to Reese's restaurant, about half a square from his store, for breakfast.

A passer-by, going to a train scheduled to leave at 7:38, glanced in the store, saw "it was bursting into flames" and gave the alarm. His description was that the flames were small, only about two feet high, and seemed to be on the display counter in the center of the store, approximately twenty-five feet from the front door. A police officer ran to the store and saw a flame which he testified "was about two feet off the floor, about six feet high and about halfway back in the store."

Paul Fennell, the proprietor of a newstand next to the Reese restaurant, saw appellant enter the restaurant about 7:15. When he heard of the fire in the "bargain house," he opened the side door of the restaurant and called to appellant that his store was on fire. His testimony was that appellant "turned around and looked at [him] in a kind of a surprised manner" and, by pointing to himself, inquired whether the witness meant him, to which the witness replied, "Yes, I mean you." His further testimony was that appellant

did not come out of the restaurant until after the fire whistle had blown and that this occurred two or three minutes after he told him his store was on fire. A witness employed in the restaurant testified that when Fennell called to appellant, the latter said, "You are crazy, I just came from there," and went on eating. A patron in the restaurant testified that when Fennell told appellant about the fire, appellant remarked to the witness, "They are kidding me," but when the fire whistle blew he jumped up and ran out.

The testimony of the firemen was to the effect that when they arrived and broke open the door they found the fire was located about halfway down the length of the store; that the burning merchandise on the table was knocked off by the water from the hose; and that the table was upset in extinguishing the fire. When this had been accomplished it was found that the table nearest to the register had been badly burned; that there was a burned place on the floor near to the register, apparently caused by burning goods thrown from the table; that goods hanging upon hooks had been partially burned, and particularly that dresses and coats on hangers along one side of the room had been burned on the shoulders. In the opinion of the firemen, the fire started on the table over the register.

The door to the cellarway is near the front of the store and to the right of the entrance. Upon examination of the cellar, it was found there was no evidence of any fire in the cellar except the one in the furnace. The fire door of the furnace was open and the draft door closed; the fire in the furnace had burned to "a cherry red."

The chief of the fire department testified that when the trucks arrived, appellant had reached the door "and was fumbling around in his pockets to give [the witness] the keys and didn't seem to be able to find them." Appellant's explanation was that he was so nervous

and upset that he could not remember in which pocket he had placed his keys.

The only articles revealed by a careful search of the premises which might be considered indicative of a possible incendiary origin of the fire were a "few [empty] cartons" which had "a lot of oil stains" on them and a "pan" upon which there was "a strong odor of gasoline;" these were found in a lot of rubbish, excelsior, floor sweepings, etc., at the foot of the cellar stairs and near the front of the building.

Appellant's explanation of the stains on the cartons was that they contained an oily sawdust with which the floor was sprinkled preparatory to sweeping and which was designed to prevent the raising of dust. As to the pan, his statement was that they had a number of pans around the store, some of which were given away as presents to customers.

Another item of evidence, furnishing some basis for suspicion, was that on the Monday following the fire when police officers, at the instance of the insurance companies, were examining the debris on the floor of the store, which was still wet and partially frozen, they found near the overturned table "a piece of a sweater" and portions of a blanket upon which they "smelled a slight odor of either gasoline or kerosene."

Abram Pogach, appellant's brother and partner, testified that the sawdust was sprinkled upon the floor sometimes from the carton and in some instances a pan was used and the pan put back in the cellar. With regard to the use of a cleaning fluid, this witness testified: "Do you have any cleaner, or anything of that sort around the store? A. A cleaner for what? For clothing? Q. For clothing, your dresses? A. Yes, for dresses we keep a cleaner. Q. What kind of a cleaner do you have around there? A. Something like—I don't know what, more or less like gasoline. Q. In what do you keep that? What do you use it for? A. For the

dresses, and cleaning the dresses. Q. Where do you get it? A. From the dress manufacturers. They have it. Q. Would you use that upon materials, upon dresses? A. Yes. Q. How often would you use it? A. How often? Oh, I don't know, twice a week sometimes. You know dresses, people come in, and keep handling them, and when they needed cleaning, we take the spots off. They get spotted whenever people handle them."

With relation to the value of the stock at the date of the fire, the testimony for the Commonwealth ranged from $9,700 to $13,560; the value of the fixtures was approximately $1,800. In this connection it should be noted that the appraisement of $9,700 was not as of the date of the fire but as of June, 1934, nor did it include the "ruins on the floor." Appellant's estimate was $15,000 for stock and $2,500 for fixtures. As stated, the insurance carried was $13,000 on stock and $2,000 on fixtures.

The manager of a branch of the Thatcher Furnace Company testified that sparks from the fire could not be thrown up through the register from a furnace of the type in the cellar. Another witness, a furnace installer, stated he had examined the furnace in June, 1934, and found it in good condition. His opinion was that it was impossible for sparks to come up from the fire in the furnace through the register, and that it was improbable that particles of paper or other inflammable material would fall through the grill in the register and catch fire.

Some question was raised at the trial as to appellant's financial condition, but the evidence indicated that he was indebted, at the time, in the amount of less than $1,000, of which $250 was rent. It was shown that in 1932 he was forced to make a settlement with some of his creditors who demanded immediate payment but that those who waited were paid in full.

This conviction should be sustained only if the evidence was sufficient in volume and quality to establish (a) that the fire was incendiary in its origin, and (b) that appellant was criminally responsible for it.

The rules by which the evidence must be tested are familiar and firmly established. It must be clear and unequivocal. Where, as here, it is sought to sustain a conviction by circumstantial evidence, the hypothesis of guilt should flow naturally from the facts and circumstances proven and be consistent with all of them. The evidence must be such as to exclude "to a moral certainty" every hypothesis save that of guilt; i. e. the circumstances shown must not only all be consistent with and point to the guilt of the accused but they must also be inconsistent with his innocence. Merely showing that an accused may have had a motive for causing a fire and opportunity to carry it into execution is not sufficient. While it is the function of the jury to pass upon the weight of evidence, it is the duty of the trial judge to determine its sufficiency and, in a proper case, declare it insufficient, as a matter of law. See Com. v. Byers, 45 Pa. Superior Ct. 37; Com. v. Bone, 64 Pa. Superior Ct. 44, and cases there cited.

Every fact and circumstance, appearing from the evidence and having any bearing upon the guilt or innocence of appellant, has been above recited. What is the result of the application of the principles of law to which we have referred to the evidence upon this record?

In the first place, the contention that appellant had over-insured his stock and fixtures may be dismissed as unsupported by the evidence of the Commonwealth itself.

The crucial question is whether the facts and surrounding circumstances exclude to a moral certainty every theory of the origin of the fire except that it was wilfully started by appellant.

Undoubtedly, the evidence of the finding of the oil-stained cartons and the pan and portions of sweater and blanket smelling of gasoline, standing alone and without a satisfactory explanation, was sufficient to raise at least a suspicion of incendiarism and of appellant's guilt.

It seems to us, however, that the explanations given by appellant and his brother were natural and rebutted the inferences of guilt which might otherwise be drawn from the discovery of these articles. At least, a court should, we think, treat them as having sufficient force to neutralize the evidence for the Commonwealth and render it equivocal and therefore not inconsistent with innocence. Experience in dealing with cases of this kind naturally suggests the thought that if gasoline had been used to make the merchandise in this store inflammable more extensive evidence of its use would have been discovered; only a comparatively small portion of the stock was consumed by the fire.

One matter which seems to have been definitely established is that the fire started in the merchandise on the table located over the register. Obviously, merchandise so placed would be particularly dry and inflammable. The mere fact that the fire started in this material does not clearly and unequivocally indicate it was of incendiary origin. A spark, generated in the process of rebuilding the fire or caused by other innocent acts of appellant, would be just as effective in causing the fire as a wilful and deliberate act of appellant. Appellant's conduct and remarks in the restaurant seem to have been equally, if not more, consistent with innocence than with guilt.

Moreover, if appellant had determined to burn the store, it is difficult to understand why he would carry such design into execution at the beginning of business on a Saturday morning. His natural impulse would

have been to reap the cash benefit of a Saturday's sales and burn the store during the night or on Sunday.

Upon consideration of all the evidence, we are convinced that it falls far short of meeting the tests to which it must be subjected. At most it establishes some grounds for suspicion, but that is not enough.

This case differs materially, upon its facts, from the decided cases in which convictions have been sustained. In Com. v. Friedman, 86 Pa. Superior Ct. 488, cited by the court below, the defendant was seen fleeing from the building at two or three o'clock in the morning and just before the fire broke out. We have been obliged to review a number of similar cases recently—Com. v. Smith, 111 Pa. Superior Ct. 363, 170 A. 331; Com. v. Skwortzo, 113 Pa. Superior Ct. 345, 173 A. 480; Com. v. Buti, ibid, 385, 173 A. 890; Com. v. Pulemena, ibid, 430, 173 A. 462; Com. v. Perdikakis, ibid, 320, 173 A. 472, and Com. v. Cucciardo, 118 Pa. Superior Ct. 149, 179 A. 784. In all of them there was proof of facts and circumstances which were clearly and unequivocally inconsistent with the defendant's innocence. For instance, in the Cucciardo case, elaborate preparations were made, including the attaching of a wire to an alarm clock, the stringing of wires in the basement, as well as the placing of large quantities of combustibles.

Having reached the conclusion that the evidence is insufficient to support the judgment appealed from, we sustain the third assignment of error, based upon the refusal of the trial judge to direct a verdict of acquittal; the other assignments need not be considered.

Judgment reversed and appellant discharged.