Commonwealth v. Trunk et al., Appellants.

556

Argued December 1, 1932. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Theodore Lane Bean,* with him *Edward F. Kane* and *Adrian Bonnelly,* for appellant.—While the proceedings in this court are denominated as "appeals," they are in reality common law certioraris; and, both at common law and under the statutes of Pennsylvania, a certiorari

from the Supreme Court will lie to review the record of the proceedings of an inferior court, though an appeal would not lie,—particularly in proceedings such as the instant cases: Com. v. Balph, 111 Pa. 365; Murray's Petition, 262 Pa. 188; Lenox v. McCall, 3 S. & R. 95.

This court, in the exercise of its general supervisory power over courts of inferior jurisdiction, has full power to determine whether it was an abuse of discretion in the court below to suspend sentence on certain of the bills: Com. v. Jones, 303 Pa. 551; Com. v. Simpson, 2 Grant 438.

In the absence of statutory authority, which does not exist in cases such as the instant cases, the right to defer indefinitely the suspension of sentence is at least doubtful: Com. v. Meleskie, 278 Pa. 385.

An appeal from the action of the court below, other than a final judgment, will be entertained, when justice requires that the appeal be heard: Frey's Est., 237 Pa. 269; Lawver v. Anderson, 72 Pa. Superior Ct. 337.

This court has full power to direct a new trial of a criminal case whenever the ends of justice require it: Com. v. Jones, 303 Pa. 551.

Whether errors were prejudicial is to be determined, not by considering merely their effect on the verdict upon any particular indictment, but also the possible effect they may have had in inducing the other verdicts.

*Herman J. Goldberg,* with him *Dennis A. O'Neill,* for appellee.—Where the sentence has been suspended, there exists no right of appeal: Marsh v. Com., 16 S. & R. 318.

The mere fact that several bills of indictment were tried together does not alter or modify this principle of law: Com. v. Thompson, 79 Pa. Superior Ct. 467; Com. v. Gittleson, 88 Pa. Superior Ct. 190; Com. v. Mellon, 81 Pa. Superior Ct. 20; Com. v. Cauffiel, 97 Pa. Superior Ct. 202; Com. v. Lipschutz, 89 Pa. Superior Ct. 142.

There is no doubt of the right of the court to suspend sentence. It cannot be urged that such suspension is in-

definite: Com. v. Morgan, 278 Pa. 395; Com. v. Carelli, 90 Pa. Superior Ct. 416.

OPINION BY MR. JUSTICE SCHAFFER, March 20, 1933:

Ralph J. Rinalducci was assistant district attorney of Montgomery County, Joseph Trunk was one of the county detectives, and Brooks Cassidy was chief of police of Upper Dublin Township in that county. William Thomas Campbell, a negro, prosecuted them charging that they had committed upon him an aggravated assault and battery and had falsely imprisoned him. The three were tried simultaneously upon eight bills of indictment, one charging them jointly with conspiracy to commit aggravated assault and battery, three charging them individually with aggravated assault and battery, one charging them with conspiracy to falsely imprison and the other three charging them individually with false imprisonment. In a trial lasting for more than a week the defendants were found guilty on all eight bills. Motions for a new trial were overruled and the judge sentenced them on the indictments charging aggravated assault and battery as follows: Rinalducci to solitary confinement in the eastern penitentiary at hard labor for a maximum term of three years and a minimum period of one year and six months; Trunk in the same way except that his minimum term was fixed at one year; Cassidy to imprisonment in the county jail for six months. On all the other indictments, sentences were suspended. The defendants appealed to the Superior Court, which affirmed the judgments of sentence of the trial court on the aggravated assault and battery bills and quashed the appeals on the other indictments on the ground that they were prematurely taken, no judgment of sentence having been entered thereon. From the action of the Superior Court, we allowed the pending appeals covering all the indictments.

We shall outline the events which culminated in the conviction of the defendants: A house in Upper Dublin

Township was dynamited about two o'clock in the morning of May 8, 1931. The house was occupied by E. K. Jones and Eliza Williams, negroes. Jones was so seriously injured that for a time it was believed he would not survive. Cassidy, chief of police of the township, started an investigation and called to his assistance Trunk, one of the county detectives. They ascertained that Campbell was on unfriendly terms with Jones and the Williams woman. Pursuing their investigation they concluded that Campbell was the perpetrator of the explosion, started to look for him and on Saturday, May 9th, found him walking along a public highway. They directed him to get in the automobile with them, intending to hold him in custody on the charge of dynamiting the house and took him to the office of Squire Crane, Justice of the Peace of Upper Dublin Township, for the purpose of lodging a complaint against him. The squire was not at his office and as Upper Dublin Township has no jail or lockup, they took their prisoner to the police station in Cheltenham Township and placed him in the township lockup, where they detained him until Wednesday, May 13th. On that day they filed an information against Campbell before Squire Crane, charging him with arson, and he was committed to the Montgomery County Prison at Norristown.

During the evening of Thursday, May 14th, Cassidy arranged with Trunk to get Campbell out of jail the next morning for the purpose of taking him to the district attorney's office and questioning him about the crime with which he was charged. Before leaving for Norristown on the morning of May 15th, Cassidy obtained from Squire Crane a discharge for Campbell. Upon his arrival at the district attorney's office Cassidy was told by Trunk that he had arranged with Rinalducci to question Campbell. Before this time Rinalducci had no knowledge of the proceeding which had been instituted against Campbell or of the occurrences giving rise to the prosecution. Rinalducci was engaged in court

when Cassidy arrived at his office and the latter went out for the purpose of getting breakfast. During his absence Trunk, not knowing that Cassidy had a discharge of Campbell from Squire Crane, procured a letter from Renninger, the district attorney, addressed to the warden of the prison asking him to release Campbell in the custody of himself and Cassidy for questioning in the district attorney's office. Armed with this letter Trunk went to the prison, had Campbell released in his custody and took him to the district attorney's office, where Rinalducci and Cassidy shortly thereafter appeared. Cassidy stated that he had a discharge for Campbell, but was advised by Rinalducci not to lodge it at the prison until they had finished questioning him.

The district attorney's office being crowded, it was decided that Campbell should be questioned at the barracks of the state police at Jeffersonville some ten or fifteen minutes driving distance away. About noon the three defendants and Campbell drove to the police barracks. It was testified by the three defendants and by other witnesses that as Campbell was entering the barracks, he tripped and fell on the concrete steps and injured his leg. This Campbell denied. He also denied that Rinalducci applied an antiseptic to the abrasion on his leg, as the defendants and the others present testified he did. When the defendants and Campbell entered the barracks, the state policemen stationed there were arranging for luncheon. They invited the defendants to eat with them, which they did, and all who were present testified that Campbell was provided with food. This he also denied.

The sergeant of the state police in charge of the barracks suggested that the defendants take Campbell to the third story of the house (it had formerly been a private dwelling) for the purpose of questioning him, since the examination could not be well conducted on the first floor on account of the presence of other persons, and the second floor contained the bedrooms of the

state police and they did not want their beds and rooms soiled by Campbell, whose clothing was not clean.

The third floor was an attic room used mainly for storage purposes. The three defendants and Campbell proceeded to this room where he sat down in a chair. They remained in this room for more than three hours. Campbell testified that during this period the defendants violently assaulted him in an endeavor to compel him to confess to the crime with which he was charged. He said Rinalducci began the assault by jabbing him on the jaw, that Rinalducci then drew a black jack, that Trunk got on his right side and Rinalducci on his left, that the latter struck him on the legs with the black jack from his ankles to his knees, and that Trunk hit him with his fist and also with a stick. He further said that when they stopped beating him "blood was coming out of my shoes"; that upon seeing this Rinalducci got some toilet paper, put something on it and wiped the blood off. He testified further that one of the state policemen came up into the attic with a sheet around him impersonating a ghost (this fact was admitted by the defendants and by the state policeman), that the state policeman left the attic, removed the sheet, returned and took a pair of overalls which were hanging there "and put the legs of the overalls to my neck, tied the sleeve of the overalls to my neck and he [the policeman] got hold of one sleeve and Joe Trunk got the other and they snatched me back and forth...... They got the overalls around my neck and choked me...... Then they tied the overalls over the beam [the beam or rafter was 5 feet 8 inches from the floor, Campbell apparently about 5 feet 9 inches tall] and they got hold and swung me up and when I come to myself again Joe Trunk had something over my eyes and they were putting something over my head. I couldn't tell what it was but it felt like an electric needle running over my head." He said that after this had taken place some one of the defendants, Cassidy it would seem, went to town and brought back a

pair of trousers, a pair of socks and some new underwear which they put on him; that they wiped the blood off and filled the holes in his legs with toilet paper, that they wrapped bandages around his legs, and they then brought him down stairs and took him to the Norristown lockup, where they put him into a cell.

The statements made by Campbell were contradicted by the defendants, and, so far as they related to the state policeman, they were denied by him, except his account of the ghost incident and his statement that he was incarcerated in the lockup and not in the county prison. He was kept in the lockup from Friday evening until the following Monday, when he was taken before Squire Crane and released on his own recognizance. He said from the Squire's office he hobbled toward home and a man in a wagon picked him up and carried him to a point near his home, whence he hobbled to the house of a friend and had supper with him. He said nothing to the driver of the wagon or to his friend about having been assaulted, or about his injuries. Seven days afterward and ten days subsequent to the time he alleged he was beaten in the police barracks (in the meantime he had made no mention to anyone of his maltreatment or shown any one his injuries), he appeared at the store of J. W. Baines, located in the vicinity of his home, and there exhibited the injuries on his legs to Baines and one Riley, who later described them as about the size of half an egg "just as if someone would take a spoon and take a piece out of each one." Baines also said Campbell had a bump on his back about as large as a fist. At Baines's suggestion, Campbell went the next day to see Dr. Shelley. Dr. Shelley testified that Campbell called upon him on May 26th, complaining about his legs, his left side, his right shoulder and his hand. The doctor said he found on his right leg four contusions about the size of a half dollar, and five smaller ones on his left leg. In addition he found a contusion near his shoulder blade and a bruise mark on his hand. He gave it as his opin-

ion that the wounds were between a week and ten days old. On the evening of May 28th, Dr. Shelley took Campbell to see Judge KNIGHT, one of the judges of Montgomery County. Judge KNIGHT testified that Campbell's legs were bared, that he saw four of five marks on each leg about the size of a twenty-five cent piece and that there appeared to be a swelling on his right shoulder.

Campbell testified that while he was in the Norris-town lockup, Rinalducci visited him only twice, on one occasion bringing him some sandwiches and a soft drink, and on the second occasion bringing some coffee. Campbell told Judge KNIGHT that, with the exception of a little milk, he had not been given anything to eat while in the Norristown lockup from Friday evening, when he was placed there, until he was discharged. Rinalducci testified that he supplied Campbell with food daily while he was in the lockup. In this he was corroborated by the policemen who were stationed there. Campbell also testified that his face was badly swollen as the result of the blows he had received in the barracks. All of the witnesses who observed him at the barracks and the policemen at the Norristown lockup said they noticed no swelling on his face. Campbell further said that when they were beating him, "I hollered out, I asked them to stop." No one in the barracks at the time heard any outcry.

Defendants complain that the Superior Court erred in refusing to consider assignments of error to those parts of the charge of the trial judge relating to indictments upon which they were not sentenced, and in quashing their appeals from the orders suspending sentence on these indictments. Our careful reading of the entire record has convinced us that the attitude of the Superior Court in these respects was a mistaken one; that justice required that consideration be given to those parts of the charge relating to the indictments upon which the defendants were not sentenced and that those

indictments and the court's comments thereon should have been taken into account in passing upon the entire case, because the charges against the defendants were so interwoven that what was said by the trial judge regarding the testimony relating to anyone of the indictments necessarily was linked in the minds of the jury with all of them. No jury could draw a clear line of demarcation between the different rulings on evidence and the different parts of the charge relating to the separate offenses.

While it may be true generally that appeals may not be taken in criminal proceedings where judgment of sentence has not been passed, this rule should not be held one of universal application. There are instances where great injustice would thereby be done to defendants. This case is an instance. Just why the trial judge suspended sentence on certain of the indictments in view of the severe sentences which he imposed upon Rinalducci and Trunk it is difficult to understand. All of the offenses charged were part of a continuous series of events and should have been so treated in sentencing. We think there was an abuse of judicial discretion in suspending sentence on the bills upon which the court did not act. In the exercise of that broad jurisdiction conferred upon us by section 13 of the Act of May 22, 1722, 1 Smith's Laws 131, 140, and June 16, 1836, P. L. 784, 17 P. S., section 41 (Com. v. Jones, 303 Pa. 551; Stone v. Phila., 302 Pa. 340; Corbin et al. v. George, 308 Pa. 201), we sustain the assignments of error to the action of the Superior Court in ruling that the parts of the charge which relate to indictments upon which the defendants were not sentenced should not be considered and the assignments quashing the appeals from the indictments upon which sentence was suspended.

The defendants submit to us, as they did to the Superior Court, that the charge of the trial judge was not a calm and dispassionate one, or, in expression or tenor, a judicial presentation of the case, or a fair and impartial

submission of the evidence. Our reading of it has convinced us that the complaint of the defendants in this respect is well founded. A review of the record satisfies us that the judge's attitude throughout the trial was biased and prejudicial to the defendants. The tone and language of the charge in many parts was that of an advocate for the prosecution, and, therefore, not such a judicial presentation of the case as the defendants were entitled to: Com. v. Stallone, 281 Pa. 41, 43; Com. v. Westley, 300 Pa. 16. As was said by Mr. Justice KEP-HART in Com. v. Myma, 278 Pa. 505, 508, "The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved. The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality." We shall not enumerate all the instances in which the trial judge in our opinion transgressed the rights of the defendants. In commenting in his charge upon the reputation evidence of the defendants, he referred to it as "the reputation his witnesses *sought to attribute to him*" and the "reputation his witnesses *endeavored* to give to him." The witnesses did not *seek* to attribute to the defendants good reputations or *endeavor* to give them good reputations. They testified that the defendants were men of good repute. This evidence was not challenged in any way by the Commonwealth. The defendants were entitled to have the judge state to the jury that the uncontradicted testimony showed that they were men of good repute, and not to have their defense prejudiced by the judge's belittling this testimony and not giving them the benefit of its full effect: Com. v. Stoner, 265 Pa. 139; Com. v. Ronello, 251 Pa. 329; Com. v. Colandro, 231 Pa. 343; Com. v. Cate, 220 Pa. 138; Heine v. Com., 91 Pa. 145.

It is alleged in the briefs of appellants that the trial judge referred to testimony in their behalf in a sneering and contempuous manner and insinuated that its truth

was questionable, cast slurs upon their motives and in other ways belittled their testimony and minimized its effect. It is difficult from the printed pages of the record to form an accurate opinion as to the manner and character of speech of the trial judge, but we are convinced that he did not properly present the case to the jury.

One of the outstanding insufficiencies in the charge of the trial judge is the way in which he treated the gravest allegation which the defendants had to face, that of aggravated assault and battery. After giving undue prominence to the conspiracy feature, he disposed of the most serious charge in the following wholly inadequate way: "With respect to the aggravated assault and battery bills, the trial judge has little to say to you. The charges are affirmed on the one side and denied on the other. You will have to say who is telling the truth. It does not seem to be disputed that Campbell and the three defendants were in the attic of the barracks of the state police. Campbell says that while there the defendants abused him. The defendants deny the allegations of the prosecutor. What happened in the attic? From the whole evidence, from both disputed and undisputed facts, you must say what happened there." This is substantially all that was said specifically so far as the allegations of aggravated assault and battery are concerned in a charge which takes up thirty-eight pages in the record. It was not pointed out to the jury that in many respects the tale of the prosecutor was contradicted. Nothing was said about the circumstance that although he alleged he had been severely beaten, he complained to no one and called his wounds to the attention of no one, either immediately following the crime subsequently alleged to have been committed upon him or for ten days thereafter. In addition to the denial of the defendants the testimony of Campbell as to the assault and battery upon him was impeached by that of three other persons who were present in the police

barracks while he was being questioned in the attic. They heard no sound of a struggle or assault, and saw no signs of blood in the attic, no complaints were made to them by him and they saw nothing in his appearance when he came down stairs which indicated that he had been assaulted. Four officers at the Norristown lockup testified that when he was brought there, they saw nothing to indicate that he had been abused, and that he did not limp and made no complaints to them.

We are also of opinion there was grave error in the trial judge's instruction that "motive is not a factor in the correct determination of the guilt or innocence of the defendants." "Motive is some cause or reason that moves the will and induces action": Words & Phrases, 1st Series, page 4613. While it may be that motive is not a factor so far as the assault and battery charges are concerned, because no matter what the motive was the act was criminal, it is a most important factor in the charge of false imprisonment. The defendants Trunk and Cassidy imprisoned Campbell in order to hold him securely while they investigated his suspected complicity in the serious crime with which they charged him. Whether they improperly held him in custody for a greater length of time than they should have without bringing charges against him could not affect their motive in taking him into custody and holding him in durance. The trial judge should have taken into account the fact that they were police officers investigating crime. Their motive, their reason for arresting and holding him was a most important part of their defense, because it tended to justify the original act of taking into custody and his detention at least for a certain time. The motives, good faith and purpose of the defendants are legitimate matters of defense to be considered by the jury in passing upon the false imprisonment indictments, as they negative the idea of criminality. McCarthy v. De Armit, 99 Pa. 63, and Taylor v. American International Shipbuilding Corp., 275 Pa. 229, although

cases of civil action, indicate the necessity of proving legal malice or want of probable cause.

We also think that in charging the jury on the subject of false imprisonment the court did not adequately point out to them that so far as Rinalducci was concerned he had nothing to do with the original false imprisonment (if there was any), since he did not come into the case until he was called upon to interrogate Campbell. The only false imprisonment that could be charged against him was that connected with placing Campbell in the Norristown lockup. His defense of reason for doing this was that he believed he had the right to hold him there while the investigation proceeded, for at least forty-eight hours under the Act of April 23, 1909, P. L. 141. Whether he did have this right is not the point at issue in the present determination. He had the right to set forth his reason for what he did in answering the charge that his action was wrong and criminal by showing that his purpose was not a criminal one, since he believed he was acting lawfully. The good faith of the defendants, who were public officers criminally charged with false imprisonment, was a matter proper for the consideration of the jury: 11 R. C. L., page 793, section 4; Com. v. Cheney, 141 Mass. 102, 6 N. E. 724.

One other position taken by the trial judge requires comment. Campbell was taken from the county prison to the office of the district attorney as a result of a letter written by the district attorney to the warden of the prison requesting his release for the purpose of questioning. The trial judge magnified this circumstance out of all proportion to its true significance. Even if the request of the district attorney to the warden was without legal warrant, which for present purposes we need not determine, it followed a practice which had existed for many years in the county and which has existed in many other counties in the Commonwealth. It has not been unusual for a district attorney to procure the temporary release

from prison of prisoners charged with crime for the purpose of aiding his investigation and preparation for trial. It is not pretended anywhere in the case that the district attorney who signed the letter and the defendant Rinalducci had any improper purpose in using it as the means of procuring Campbell's release from the prison; and yet the trial judge charged in this fashion: "The following letter was written and signed by the district attorney of Montgomery County: 'Mr. Martin L. Horn, Warden, Montgomery County Prison, Norristown, Pennsylvania. My dear Warden. Kindly release William Thomas Campbell in the custody of Detective Trunk and Chief Cassidy. He is wanted for questioning in the district attorney's office. For so doing this shall be your sufficient warrant.' *That warrant was illegal.*" At this point, one of the counsel for the defendants interrupted the court, saying, "I want to object to the attitude of the trial judge. It is very prejudicial to these defendants." The court immediately resumed, saying: "If the prisoner Campbell was released from the Montgomery County Prison by virtue of the letter signed by Frank X. Renninger, the district attorney, the prisoner was removed by illegal process." The court then quoted to the jury part of section 12 of the Habeas Corpus Act of February 18, 1785, 2 Smith's Laws 275, 12 P. S., section 1887, as follows: "Any person, being committed to any prison, or in the custody of any officer, sheriff, jailor, keeper or other person, or his under-officer or deputy, for any criminal or supposed criminal matter, shall not be removed from the said prison or custody into any other prison or custody, unless it be by habeas corpus or some other legal writ, or where the prisoner is delivered to the constable or other inferior officer, to be carried to some common jail, or where any person is sent by any judge or justice, having proper authority, to some common workhouse or house of correction, or where the prisoner is removed from one place to another within the same county in order to his or her trial or

discharge in due course of law." The court did not read the rest of the section, "or in case of sudden fire or infection, or other necessity; and if any person or persons shall, after such commitment as aforesaid, make out, sign, countersign, and issue any warrant or warrants for such removal, except as before excepted, then he or they shall forfeit to the prisoner or party aggrieved, two hundred pounds, to be recovered by the prisoner or party aggrieved, in manner aforesaid." This section of the act has apparently never been construed from the time of its passage in 1785 until today. Just what its meaning is in all respects is not altogether clear. Apparently its purpose, when consideration is given to other provisions of the law, was to prevent the spiriting of prisoners from one jail to another without resort to habeas corpus proceedings. The trial judge further said: "The so-called warrant of the district attorney was illegal and his request should have been ignored by the warden of the jail." The letter of the district attorney was not a warrant and no one contends that it was. The court added: "There were just two ways in which the legal release of Campbell could have been accomplished. In the first place, the justice of the peace who had committed Campbell for a further hearing had the power also to have him discharged for such hearing. ......
He might have presented to one of the judges a petition for allowance of a writ of habeas corpus. The judge could have awarded the writ and fixed a time for hearing and, after sufficient notice to the district attorney to enable him to gather and present at hearing evidence warranting the further holding of Campbell, if the judge was of opinion the testimony presented was insufficient for continued detention of the prisoner, the judge could have discharged the prisoner." This instruction ignores the fact that Campbell was not being taken out of jail for the purpose of a further hearing, but for the purpose of interrogating him. The district attorney and the officers had the right to interrogate him, provided they

did it in a proper way. The trial judge further said: "Even the judge could not have ordered the discharge of Campbell from jail except after application by him for a writ of habeas corpus and after hearing with due notice to the district attorney and opportunity afforded him for the presentation of evidence on the part of the Commonwealth." Again we observe that what was sought was not the discharge of Campbell from jail, but his temporary release for the purpose of interrogation. Then the court said: "No judge of this court has a legal right to send a letter to the warden of the jail directing him to release a prisoner in the custody of police officers for questioning." The matter before the court was not a letter from a judge, but a letter from the district attorney. He added to this: "A judge may not direct the discharge of a prisoner from jail willy-nilly. Like everyone else, a judge is bound by the law of the land. He can order a discharge only after a public hearing, at which the Commonwealth must be given opportunity to present whatever evidence exists to show the prisoner ought not to be released. As you have seen, according to the Act of 1785, the letter of the district attorney to the warden was not a sufficient warrant, within the meaning of the law, for the release of Campbell and he was removed from the Montgomery County Prison by illegal process." This was an utter misinterpretation of the Act of 1785 and of the action of the district attorney in writing the letter to have Campbell released. The judge was talking about one thing, the discharge of the prisoner for hearing, and the letter related to an entirely different thing, his temporary release in order that he might be questioned. The trial judge further adversely affected the defense by stating to the jury: "It is said for a long time it has been the custom of the district attorney of this county to effectuate the release of prisoners in the manner in which Campbell was removed from jail. Indeed, it is said that upon some nineteen prior occasions during the present year a prisoner was so released. Be that

as it may, noncompliance with law can never be justified by custom or usage. Of course, if the defendants Trunk and Rinalducci, as young and comparatively inexperienced men, entered the office of the district attorney and there became subordinates of an older man of presumably greater experience and if thus Trunk and Rinalducci were misled by prevailing customs and practices the correctness of which they took for granted on the theory that otherwise they would not be in vogue, they are entitled to our sympathy. ...... If the defendants Trunk and Rinalducci were not properly supervised by their chief with respect to the performance of their duties, upon conviction such lack of guidance may be a matter for consideration by the trial judge. It is not, however, for your consideration in determining their guilt or innocence. Trunk was a county detective. Rinalducci was an assistant district attorney. Every man is presumed to know the law,—even if he be a layman. Certainly, the presumption does not fall away from an officer of the law,—particularly if he be a member of the bar. Any person who accepts public office must be presumed to know the law with respect to the administration of the duties of the office accepted." This was virtually an instruction by the judge that the defendants had been engaged in an illegal act and that their motives and intent, or mistake if they were mistaken, were not to be considered by the jury in determining their guilt or innocence. We could not for a moment sanction such a ruling. If the defendants, even though mistaken or misinformed, in good faith acted as they did, the jury was entitled to consider that they had acted in good faith before they branded them as criminals. In this connection, it should be borne in mind that Cassidy had a discharge of Campbell from Crane, the justice of the peace, and on this he could have been released from the jail, so there was no real purpose in preferably using the letter to procure this result. If the defendants acted under a custom which had prevailed in

the county and with which they were familiar, this in itself might negative the idea of any criminal purpose in their actions.

After the trial court's attention had been called by counsel for the defendants to the fact that his charge as to the letter was prejudicial to them, the court almost at the end of his charge said to the jury: "You will recall, members of the jury, whether the testimony did or did not indicate that the defendant Rinalducci had secured the letter for the warden from Mr. Renninger; whether Mr. Renninger dictated the letter to Miss Thomas after she had advised him that the defendant Rinalducci or some other defendant wished the letter. These cases are not damage suits. If they were, certain evidence which has been excluded might have been admitted for mitigation of damages. If the defendants are convicted there may be many circumstances in the cases going to the mitigation of punishment which have not been brought out and which have no bearing upon either the guilt or innocence of the defendants." This reflected upon the good faith of the defendants in their use of the letter. It was proper for the jury to take their good faith into account. It was highly prejudicial to them for the court to say in effect that he would take it into account when he came to sentence them, if they found the defendants guilty. This was an invitation to the jury to so find them.

In his rulings on evidence and instructions to the jury on the law of false imprisonment, the judge would seem to have had more in mind the rulings made by the courts in civil actions of false imprisonment than in instances where men were charged with the crime of false imprisonment. In the latter class of cases the law is more liberal than it is in the former, particularly to officials charged with the enforcement of the criminal law. The basic charges against these defendants were that they had committed an aggravated assault and battery upon the prosecutor and had falsely imprisoned him.

The indictments charging conspiracy to commit the assault and battery and conspiracy to falsely imprison him were of little or no consequence when standing by the main charges. Indeed, the Commonwealth might well have proceeded on the main indictments alone, disregarding the ones charging conspiracy, because the conspiracies were merged in the consummated offenses.

We have not commented upon a number of other alleged errors. To do so would unduly extend this already very long opinion. When the defendants are again tried, we have no doubt the trial will be conducted with due regard to the rights of both the defendants and the Commonwealth, and that it will proceed in the calm and impartial atmosphere which should characterize all trials in the criminal courts and elsewhere.

The judgments of the Superior Court are reversed, its orders quashing certain of the appeals are set aside, and the records are remitted to the court below with directions to grant a new trial on all the indictments.