Commonwealth v. Goldberg et al., Appellants.

Argued December 13, 1937.

Before
KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Edwin M. Abbott,* with him *David W. Niesenbaum,* for appellants.

*Franklin E. Barr,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY RHODES, J., January 27, 1938:

Appellants, Thomas J. Goldberg and Harry S. Nurock, together with three others, were convicted of (1) obtaining money by false pretenses; (2) conspiracy to cheat and defraud; and (3) soliciting contributions for charitable purposes without authorization, etc. Each of the appellants received a sentence of two years in the county prison on the charge of obtaining money by false pretenses. On the other charges sentence was suspended as to both appellants.

Appellants' principal contention on this appeal is that the evidence was insufficient to convict them on

the three indictments, and that the trial judge should not have allowed the jury to pass upon it. See *Com. v. Trunk et al.,* 311 Pa. 555, 167 A. 333.

The Commonwealth called a large number of witnesses, and presented many exhibits resulting in a voluminous record. None of the defendants testified, and no evidence was offered on their behalf.

In 1926 a charter was granted by the Court of Common Pleas No. 2 of Philadelphia County to the Pennsylvania Society of Naturopaths, which conducted the Naturopathic Hospital, 1522 W. Girard Avenue, Philadelphia. Nurock was secretary, and Goldberg treasurer of the corporation. The latter was also hospital superintendent and executive director. On July 13, 1936, the Department of Welfare issued a certificate on application signed by Goldberg as treasurer of the corporation, and attested by Nurock, authorizing the solicitation of funds in accordance with the Act of May 13, 1925, P. L. 644, as amended (10 PS §141 et seq.). In October, 1936, Goldberg discussed with Robert Hoffman the fact that they wanted to have a dance for the benefit of the hospital. Hoffman advised him that he had a set-up for such purpose. Goldberg ordered 4,000 tickets for the dance on April 30, 1937, leased offices in the Fox Building, and made arrangements with the Bellevue-Stratford Hotel for the use of the ballroom, for which $400 was to be paid; $200 was paid on account. Additional tickets were delivered to the Fox Building in November, 1936, and on March 4, 1937; letterheads, giving committee headquarters in Fox Building and list of executive committee, together with envelopes, were also delivered to the Fox Building. All tickets and stationery were paid for in cash, on delivery, by some one in the office in the Fox Building. On November 9, 1936, a letter was addressed to the Pennsylvania Company for the Insurances on Lives and Granting Annuities, authorizing the opening of a bank account by Hoffman,

and authorizing the making of deposits and withdrawals. This letter was on stationery with the heading "Naturopathic Hospital (Non-Sectarian) Committee Headquarters Room 307 Fox Building 1612 Market Street Philadelphia, Pa.," containing the names of the executive committee, the number of the Department of Welfare permit, to wit, 709, and was signed by Nurock as secretary. The account opened on November 13, 1936, in the Pennsylvania Company was in the name of "Naturopathic Hospital c/o Robert Hoffman Fox Bldg., Room No. 307 Philadelphia." Deposits and withdrawals in this account were made from November, 1936, to April 24, 1937.

On March 1, 1937, the Pennsylvania Society of Naturopaths entered into a written agreement with Hoffman for the dance and entertainment for the benefit of the Naturopathic Hospital to be held at the Bellevue-Stratford Hotel on April 30, 1937. This agreement stipulated that Hoffman was to take over sale of tickets, to be responsible for all details incident to the dance, and to receive 15 per cent of all ticket sales, and that this was to be his full compensation. A copy of this agreement was forwarded to the Department of Welfare at Harrisburg. This agreement was signed by Goldberg, as executive director, on behalf of the Pennsylvania Society of Naturopaths, and it was witnessed by Nurock. It would seem that a license was secured from the Mayor of Philadelphia for the holding of the dance and entertainment, which was subsequently revoked. Hoffman was in charge of the headquarters in the Fox Building from October or November, 1936, until April, 1937.

Hoffman provided the organization for solicitation and sale of tickets by telephone. Solicitors were obtained through newspaper advertisements, and solicitation and sale of tickets took place both before and after the execution of the written contract on March 1, 1937.

Prospective telephone solicitors reported to Hoffman at the committee headquarters in the Fox Building, and those selected were referred by him to the Clinton Hotel in Philadelphia. There the telephone solicitors were in charge of Charles Reichner, alias Braun. By Reichner some of the solicitors were sent to the King Hotel, in Philadelphia, where they met Charles L. Thompson, Jr., under whom they there operated. (Hoffman, Reichner, alias Braun, and Thompson were indicted and convicted with appellants.) These solicitors received commissions of 25 per cent of the ticket sales which were finally consummated by payment. The tickets were delivered to those who agreed to buy by messengers who received their directions from Hoffman, and to whom they remitted the collections made. For their services they received 15 per cent of the amount collected. With every ticket delivered there was sent a letter purporting to be signed by Nurock. There is no direct evidence that Nurock actually signed the letters or that he or Goldberg had any knowledge of their contents. The Commonwealth also offered in evidence a letter on the committee stationery, which described the work being done by the naturopaths in Philadelphia, and also a typewritten statement, apparently to be used by solicitors in the sale of tickets. These exhibits contained no signatures, and we find in the evidence no connection between them and appellants. The evidence goes no further than to show that Hoffman was in entire charge of solicitation and sale of tickets; and, while it is clear that the commissions paid by Hoffman totaled 40 per cent, it may only be surmised that appellants had knowledge that Hoffman was paying 15 per cent to collectors, and 25 per cent to solicitors, or that they had knowledge of Hoffman's methods generally in conducting the campaign for the hospital.

There is no doubt that some of the representations made by the telephone solicitors were false. For

example, some of them represented themselves as Dr. Foster. They did not know Dr. Foster, and had no authority from any such individual to use his name.

On April 19, 1937, the certificate issued by the Department of Welfare on July 13, 1936, was revoked, about which time appellants were arrested.

On behalf of the Commonwealth thirty-one persons, who had been solicited, testified, twenty-seven of whom paid for tickets. No one was able to state by whom he was called on the telephone or to whom he made payment upon delivery of the tickets.

Although the testimony is replete with details as to the method of operation of Hoffman's organization, it nowhere appears that appellants exercised any control over it or had any knowledge of the methods used. There was no solicitation by appellants, nor did they, according to the evidence, make any sale of tickets. No solicitor or collector testified that he knew appellants or ever came in contact with either of them.

A statement made by Goldberg to the police was introduced in evidence, and therein Goldberg stated that he had no knowledge of any instructions issued by Hoffman to the solicitors and collectors, or of the payment of excessive commissions; that he took Hoffman's word for what he turned over, and as to the methods used.

No settlement or accounting was made by Hoffman; the arrests in April, 1937, putting an end to his operations.

The evidence showing the alleged connection of Goldberg with the crimes charged may be summarized as follows: Goldberg was treasurer of the Pennsylvania Society of Naturopaths and executive director and superintendent of the Naturopathic Hospital; he arranged with Hoffman for the solicitation and sale of tickets for the benefit dance; he rented the headquarters in the Fox Building; he ordered about 4,000 tickets, on or about October 19, 1936, which were delivered to

the Fox Building, and paid for by some one in the office; he arranged for the use of the ballroom of the Bellevue-Stratford Hotel for the dance to be held on April 30, 1937; he signed the contract as executive director of the Pennsylvania Society of Naturopaths with Hoffman; he received from Hoffman about $2,200 from the sale of tickets.

As to Nurock, the evidence which must be relied on to convict him of the crimes for which he was indicted and tried is the following: That he was secretary of the Pennsylvania Society of Naturopaths; that he signed the letter dated November 9, 1936, addressed to the Pennsylvania Company for the Insurances on Lives and Granting Annuities, stating that, at a regular meeting of the hospital held on November 9, 1936, Robert Hoffman was authorized to open an account and make deposits and withdrawals as may be necessary from time to time; that his name appeared on letters accompanying each ticket.

It is the Commonwealth's contention that the whole proceeding was a criminal charity racket of which appellants were a part.

One of the indictments charged appellants and the other defendants, between the ninth of November, 1936, and the first day of March, 1937, with unlawfully soliciting and collecting contributions in money "for a certain corporation named the Naturopathic Hospital, for a charitable and benevolent purpose, to wit, for the purpose of hospitalization of children undergoing treatment for and recovering from the effects of infantile paralysis, without a written authorization from said corporation for which the contributions were made, signed by an officer of said corporation for which said contributions were collected, and setting forth the percentage of collections, or other compensation for collections, to be paid to the persons so soliciting or collecting contributions." Nowhere in the evidence does

it appear that appellants solicited and collected contributions for the Naturopathic Hospital without a written authorization from the corporation. In the absence of any evidence supporting the charge in this indictment against the appellants their conviction thereunder cannot be sustained.

In the indictment for obtaining money by false pretenses, the pretenses described therein are: (1) That appellants were lawfully licensed and practising doctors of medicine and surgery in the city of Philadelphia; (2) that there were then a large number of children in the building and hospital conducted by certain body corporate named and called the Naturopathic Hospital; (3) that said children were then and there undergoing treatment for infantile paralysis; (4) that said corporation was then in need of contributions, donations, and subscriptions in money to be used in the care and treatment of said children. To sustantiate these averments, the record is likewise devoid of any evidence. Nowhere does it appear that appellants represented themselves as doctors of medicine and surgery. In fact, the prefix "doctor" nowhere appears in connection with Nurock's name. Goldberg did use the prefix "doctor." He held a degree from the American College of Naturopathy in New York City. He had resided in Philadelphia about 43 years, and had registered with the Department of Public Instruction, Bureau of Professional Licensing, for 1935, but had not registered for 1936 and 1937. He had been licensed in the state of Pennsylvania by the Board of Naturopathic Examiners on the 15th day of September, 1927, as a naturopathic physician. As to the second alleged false pretense, there is also no proof. In fact, no one is shown to have made such representation as alleged in (2). The Commonwealth entirely failed to prove that any one made the statement embodied in the third alleged false pretense;

and, as to the fourth, there was likewise no proof produced by the Commonwealth that it was false.

As stated in *Commonwealth v. Johnson*, 312 Pa. 140, at page 143, 167 A. 344, at page 345: "In 25 C. J., page 589, the completed crime is thus defined: 'A criminal false pretense may be defined to be the false representation of an existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive, and does, in fact, deceive, and by means of which one person obtains value from another without compensation.'" The Commonwealth did not prove that any one parted with anything because of any false representation made to them by appellants.

There was no solicitation or sale of tickets made by either appellant; nor did any one of the thirty-one witnesses who testified as to solicitation say that they knew appellants, that appellants had solicited them, or that any payment for tickets had been made to either. The Commonwealth failed to show such statements or conduct from which the appellants' guilt on this charge could properly and legitimately be inferred.

The third indictment charged that appellants and others did, on the 11th day of November, 1936, "unlawfully, falsely, fraudulently, wilfully and maliciously combine, confederate, conspire and agree together, between and amongst themselves, by divers unlawful, false, fraudulent, wilful and malicious means, devices and contrivances, pretenses and representations, then and there unlawfully, falsely, fraudulently, wilfully and maliciously to cheat and defraud" the various individuals named in the indictment.

To sustain appellants' conviction on the charge of conspiracy their guilt must be inferred from the circumstances; there was no direct proof of any conspiracy.

In *Commonwealth v. Bardolph et al.*, 326 Pa. 513, at page 521, 192 A. 916, at page 920, in an opinion by Mr.

Justice Maxey, our Supreme Court said: "In dealing with a prosecution for conspiracy we recently said, in *Com. v. Benz*, 318 Pa. 465, 472, 178 A. 390: 'An unlawful combination, like any other substantive fact, must be established by sufficient evidence. Where it is direct and positive, the question of sufficiency is answered. The jury may then pass on the credibility of the witnesses. But, when a charge of crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved, and be consistent with them all. The evidence must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence: *Com. v. Bone*, 64 Pa. Superior Ct. [44] 45; *Com. v. Byers*, 45 Pa. Superior Ct. 37; *Com. v. Kolsky*, 100 Pa. Superior Ct. 596. It is the duty of the trial judge, after the evidence of the Commonwealth has been fully produced, to determine as a matter of law whether the proof has been sufficient in volume and quality to overcome the presumption of innocence, and thus put the accused to a defense: *Com. v. Bone*, supra.' "

Any unlawful combination entered into by appellants must have been with Robert Hoffman; criminal collusion between themselves only or with any one else could not be deduced from the evidence. Was there a corrupt agreement between appellants, or either of them, and Hoffman? "Mere suspicion and possibility of guilty connection is not to be received as proof in such cases: *Benford v. Sanner*, 40 Pa. 9": *Com. v. Benz*, and *Com. v. Routley*, 318 Pa. 465, at page 467, 178 A. 390, at page 391.

There was a direct contact between Goldberg and Hoffman. No direct contact was shown between Hoffman and Nurock. The arrangement for Hoffman to

have charge of solicitation and sale of tickets would not in itself be an unlawful act or show a conspiracy. Such an arrangement might well be for a legitimate purpose. The same is true of the entire conduct of appellants as disclosed by the evidence. Hoffman's methods may or may not have been known to them. ¿ Surely, on the facts shown by the Commonwealth, a corrupt agreement, and the criminal intent of the parties thereto, to commit unlawful acts, are "not the only reasonable interpretation of which those facts are susceptible": *Com. v. Bardolph et al.*, supra, 326 Pa. 513, at page 522, 192 A. 916, at page 921.

We are of the opinion that to sustain these convictions would be to establish an untenable doctrine beyond the limitations of the established principles of our criminal law. It requires little imagination to conceive of a hospital of unquestionable merit, through its officers, arranging for the raising of funds with an individual or organization specializing in such an enterprise, where wrongdoing of such individual, or the staff of such organization, could exist without knowledge thereof by the officials who made the arrangement or agreement on behalf of the institution receiving the fruits of the solicitors' illegal methods.

Accepting as true all the facts proven and the legitimate inferences which may be deduced therefrom, they fail to exclude to a moral certainty every hypothesis but that of guilt of the offenses imputed to appellants. Under the facts it is as probable that appellants were innocent of criminal wrongdoing as guilty; they are not inconsistent with their innocence.

We do not determine that appellants are innocent, but we cannot escape the conclusion that their guilt has not been shown by proof that measures up to the legal requirements. In the absence of sufficient evidence in volume and quality to overcome the presump-

tion of innocence, appellants' convictions cannot be sustained.

Judgments of the court below are reversed, and both defendants are discharged.