Commonwealth *v.* Litman, Appellant.

Argued March 19, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Nochem S. Winnet,* with him *Charles M. Solomon, Francis X. Hope, Jr.,* and *Fox, Rothschild, O'Brien & Frankel,* for appellant.

*Juanita Kidd Stout,* Assistant District Attorney, with her *James N. Lafferty,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

OPINION BY ERVIN, J., September 11, 1958:

The defendant, Benjamin N. Litman, a medical doctor, duly licensed to practice medicine, was convicted and sentences were suspended on 11 bills of indictment, each of which charged him with having committed the felony of obtaining money by false pretenses from the Medical Services Association of Pennsylvania, hereinafter called "Blue Shield." Each indictment further charged that the defendant falsely represented to Blue Shield that he did personally provide and perform certain surgical and medical services for a named person at Wynnefield Hospital; that he was the medical doctor in charge of the patient; that, on the contrary, the surgical services were performed by a certain named chi-

ropodist and that the patient was under the care and charge of the chiropodist during patient's confinement in the hospital.

The evidence showed that Blue Shield is a nonprofit corporation created under the provisions of the Nonprofit Medical and Dental Service Corporation Act of 1939, hereinafter referred to as "Medical Act," as amended (15 PS §2851-1501 et seq.), and that it operates a medical care plan under contracts with subscribers and under contracts with doctors. The defendant doctor made a written application to Blue Shield in which he stated that he was "a doctor of medicine licensed to practice in the State of Pennsylvania, and I agree to *provide* medical services in accordance with 'The Medical Service Plan of the Medical Service Association of Pennsylvania.' " (Emphasis added) The plan contained a section with a heading in large black type: "REPORTING SERVICES PROVIDED TO SUBSCRIBERS". (Emphasis added) The first sentence in this section is as follows: "In order for the Association to compensate Participating Doctors, it is necessary that they promptly report all services *provided* to subscribers to the Association on a DOCTOR'S SERVICE REPORT." (Emphasis added) In each of the 11 cases the defendant, as a medical doctor and as the owner and operator of Wynnefield Hospital, filed the doctor's service report with Blue Shield. In each of these reports the defendant signed the following: "I certify that I was the doctor in charge of the patient during the period shown above and that I am legally qualified to perform the service stated herein and that I *personally provided* said service." (Emphasis added) Preceding this certificate was a description of the service provided, under a paragraph which contained the following heading: "REPORT ONLY THE SERVICE YOU PERSONALLY RENDERED THE PATIENT". The defendant

left blank item 23, which contained the following language: "If any other physician participated in the case, give name, address and relationship to case:". In each case the Blue Shield, relying upon the doctor's service report, made payment to defendant of the fee provided in the fee schedule. These prosecutions were brought upon complaint of the Blue Shield when it became aware that the defendant had not personally *performed* the surgical operations upon the subscribers. Accompanying each check in payment was a printed statement addressed to the defendant and prepared by Blue Shield saying that payment had been made to defendant for the services *provided* by him. Several of the subscribers, as witnesses for the Commonwealth, generally testified to the pre-operative and post-operative care and the laboratory and surgical services that were provided for them in defendant's hospital. Most of the subscribers recollected having given their written consent to the hospital to perform the operations. Almost every one of the chiropodists who were called by the Commonwealth testified to the fact that he had recommended to his patient a surgical operation; that he was not properly equipped in his office to perform the operation and that he had recommended to the patient the Wynnefield Hospital for this purpose; that the patient gave his written consent for the operation to the hospital and not to the chiropodist; that he himself had performed the operation in Wynnefield Hospital; that the defendant was the doctor in charge of the patient while the patient was in the hospital; that the defendant actually provided pre-operative examinations of blood and urine and pre-operative care, including foot bath; that the defendant was available and present in a supervisory and consultative capacity at all times during the operative procedures. Some of the chiropodists testified that the defendant might have

been present in the operating room during the operation but in most instances they stated that he was not actually present in the operating room during the operation. The evidence also revealed that the Joint Commission on Accreditation of Hospitals has established rules and regulations for accredited hospitals; these provide that while a chiropodist may be given hospital privileges by the hospital staff, the chiropodist while operating in the hospital does so in the capacity of a technician under a medical doctor in charge. A patient while in the hospital is under the charge of a medical doctor who has the ultimate responsibility for the patient's welfare. The medical doctor in charge need not be in actual attendance during the operation or actually perform the surgery or himself examine the patient before or after the operation.

Defendant's first contention is that the penal provision of the Nonprofit Medical and Dental Service Corporation Act, which provides: "Any person, partnership, association, common law trust, or corporation, that violates any provision of this act or of any order of the Department of Health or of the Insurance Department made pursuant thereto, any person who hinders or prevents the Department of Health or the Insurance Department in the discharge of any duty imposed on it by this act, any person who fraudulently procures or attempts to procure any benefit under this act, and any person who wilfully makes any false statement in any proceeding or report under the provisions of this act, shall be guilty of a misdemeanor, and, on conviction thereof, shall be sentenced to pay a fine of not more than one thousand dollars ($1000) or to be imprisoned for not more than six (6) months, or both, in the discretion of the court. Any act or default by any corporation, association, or common law trust, in violation of any provisions of the act or of any order

of the department made pursuant thereof, shall be deemed to be the act or default of its officers or directors who participated in authorizing or effecting such act or default or who knowingly permitted it.", Act of June 27, 1939, P. L. 1125, §17, as amended May 12, 1949, P. L. 1261, §1, 15 PS §2851-1517, is in direct conflict with §836 of The Penal Code, which provides: "Whoever, by any false pretense, obtains the signature of any person to any written instrument, or obtains from any other person any chattel, money, or valuable security, with intent to cheat and defraud any person of the same, or being an officer, manager, agent, employe of or in any way interested in any person, by false pretense, knowingly and with intent to defraud, procures, obtains, or aids, assists, or abets in obtaining from any other person, any chattels, moneys, or valuable securities for such person of which he is an officer, manager, agent, employe or in which he is in any way interested, is guilty of a felony, and on conviction, shall be sentenced to pay a fine not exceeding five thousand dollars ($5,000), or undergo imprisonment not exceeding five (5) years, or both. . . ." Act of June 24, 1939, P. L. 872, §836, as amended May 21, 1943, P. L. 306, §1, 18 PS §4836. Defendant argues that the Medical Act was originally enacted June 27, 1939, amended May 21, 1943, and re-enacted May 12, 1949; that §836 of The Penal Code covering false pretenses was enacted June 24, 1939, and amended May 21, 1943; that the two penal provisions are in irreconcilable conflict; that under §63 of the Statutory Construction Act (46 PS §563)[1] the special provisions

---

[1] "Whenever a general provision in a law shall be in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions be irreconcilable, the spe-

of the Medical Act must prevail and be construed as an exception to the general provisions of The Penal Code defining false pretenses inasmuch as the Medical Act was enacted after The Penal Code. He contends, therefore, that prosecution, if any, must be brought under the penalty provisions of the Medical Act; that under the Supreme Court decision in *Com. v. Brown*, 346 Pa. 192, 29 A. 2d 793 (where the Court held that defendant, who made a false statement in an affidavit required to a nomination paper under the Election Code, had to be prosecuted under the penalty provision of the Election Code and not for perjury), this prosecution is improperly brought.

In *Com. v. Brown*, supra, Mr. Justice (later Chief Justice) MAXEY said, at page 199: "It is the policy of the law not to permit prosecutions under the general provisions of a penal code when there are applicable special penal provisions available."

In *Com. v. Shimpeno*, 160 Pa. Superior Ct. 104, 50 A. 2d 39, Judge (now President Judge) RHODES held that the special two-year limitation statute of the Act of June 24, 1939, P. L. 872, §732, prevails over the general statute of limitations.

The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. *Com. v. Falls and Sykes*, 107 Pa. Superior Ct. 129, 133, 134, 162 A. 482.

cial provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the Legislature that such general provision shall prevail." Act of May 28, 1937, P. L. 1019, art. IV. §63.

The alleged criminal act of obtaining money by a false representation is a felony under the general penal code and a misdemeanor when committed in connection with the Medical Act. To obtain a conviction under §836 of The Penal Code the Commonwealth must prove (1) a false representation, (2) reliance upon that representation, and (3) the procuring of a benefit by the defendant with intent to defraud. To obtain a conviction under §17 of the Medical Act the Commonwealth must prove (1) a false representation, (2) reliance upon that representation, and (3) the procuring of a benefit by the defendant with intent to defraud. The same facts must be proved to obtain a conviction under either act. The court below analyzed the Medical Act and concluded that there was no conflict between this act and The Penal Code covering false pretences. It therefore held that the rule in the *Brown* case was not applicable. It further determined that the word "benefit" in that portion of the penalty clause of the Medical Act which reads: ". . . any person who fraudulently procures or attempts to procure any *benefit* under this act. . . ." was intended by the legislature to refer only to subscribers who procure or attempt to procure medical benefits by fraudulent means. We cannot agree with this conclusion. The reasoning of the court below is largely dictated by its premise that "the defendant obtained the money in this case, not by reason of any requirement or provision in the Act, i.e. not 'under this Act,' but as the result of a misrepresentation in a report required to be made by him under a contractual arrangement with Blue Shield." The court below overlooks the fact that the legislature, in the Medical Act, specifically referred to the agreement or contract between the doctor and Blue Shield in a number of places. In §8 of the act, the right is given to every doctor of medicine to register with the

Blue Shield for general or special medical services. In §9 of the act it is provided that "persons of over-income shall be liable to doctors of medicine . . . registered with the corporation . . . for the full amount of the usual fees and charges for such services made by such doctors of medicine . . . and any payment made by the corporation to doctors of medicine . . . shall be a payment to the extent *agreed upon* between the corporation and the doctors of medicine. . . ." (Emphasis added) In §12 of the act the Insurance Department is given jurisdiction to approve methods and rates of payment by the Blue Shield to doctors of medicine. It is quite clear to us that the Medical Act expressly provides for and contemplates a contract between the doctor and Blue Shield. It is a fact, of which any court could take judicial notice, that doctors have rendered great service to the public, and particularly to those of the low income group, without adequate compensation and, in fact, without any compensation in many cases. While it is undoubtedly true that the Medical Act was designed to benefit the subscribers by securing the services of doctors for them, it could not be said that the legislature did not also contemplate a benefit to doctors by providing this method of insurance for the payment of their fees. The Medical Act provides a complete system for the payment of doctors' fees for services rendered in behalf of Blue Shield to its subscribers. It provides for regulation and supervision of the enterprise by the Departments of Health and Insurance; it carefully describes the scope of service to be rendered; it carefully defines the rights of doctors of medicine and dental surgery; it places certain limitations on the subscriber's contract; it provides for the supervision of contracts by the Department of Insurance; it provides for the medical and dental service reports to be filed with the Department

of Health; it provides a complete set of penalties including the one here involved; it expressly provides for by-laws for the regulation of Blue Shield; it expressly provides that "All matters, disputes, or controversies relating to the medical . . . services rendered by the doctors of medicine . . . or any questions involving professional ethics, shall be considered acted upon, disposed of, and determined only by doctors of medicine . . . as selected in a manner prescribed in the by-laws of the nonprofit medical and dental service corporations." We are of the opinion that the penal provisions of the two acts are in irreconcilable conflict and that the special penalty clause of the Medical Act must prevail. Our disposition of this phase of the argument is sufficient to dispose of this appeal. We would like to say, however, that we entertain grave doubts as to whether the defendant actually misrepresented any facts in his service report to Blue Shield. All that the doctor was obliged to do under his agreement with Blue Shield was to personally provide services. This is what he certified that he did. He did not have to personally perform the operation in order to provide the services to the patient. No other physician participated in the case and therefore leaving blank item 23 covering this subject was not a misstatement of fact. The services had been rendered to the subscriber as the report indicated and under the law of Pennsylvania the chiropodist had the right to perform minor surgery upon the foot. Act of August 10, 1951, P. L. 1203. Under the rules and regulations of the Joint Commission on Accreditation of Hospitals a chiropodist could operate in the hospital in the capacity of a technician under a medical doctor in charge. The defendant was the medical doctor in charge and no other physician was present. He was available to render the services of a doctor or surgeon if an emergency

should arise. He did furnish the pre-operative and post-operative care to the patient. He really made no statement nor did he certify to anything in his service report which was not actually the fact.

We cannot perceive that anybody was defrauded of anything. The subscriber received the service for which he paid and the Blue Shield paid for that service the exact amount which it agreed to pay. The service rendered to the subscriber was authorized under the law of Pennsylvania and was satisfactory to the subscriber. It is true that under the law of Pennsylvania Blue Shield was not permitted to make direct payment to a chiropodist for the performance of such service. It did not make payment to the chiropodist but made payment to a qualified doctor of medicine who was in charge of the case and who provided the service. At most this seems to be a highly technical argument concerning the use of certain words in the doctor's service report. The wording of the certification was changed by Blue Shield after it became aware of the alleged offenses complained of in this proceeding. The word "provided" was changed to "performed" so that the certification now reads: ". . . I personally performed said service." This would indicate that even Blue Shield had some doubt as to the clarity of the language used in the report. If there was uncertainty in the language used, it should be construed as favorably to the defendant as in good conscience will be permitted because Blue Shield drew the written instrument.

At most this seems to have been a controversy involving professional ethics or involving a service rendered by a doctor and might well have been disposed of under §8(c) of the Medical Act providing: "All maters, disputes, or controversies relating to the medical or dental services rendered by the doctors of medicine

or doctors of dental surgery, or any questions involving professional ethics, shall be considered acted upon, disposed of, and determined, only by doctors of medicine or doctors of dental surgery as selected in a manner prescribed in the by-laws of the nonprofit medical and dental service corporations." Act of June 27, 1939, P. L. 1125, §8(c), as amended May 12, 1949, P. L. 1261, §1, 15 PS §2851-1508(c).

The convictions are reversed and the defendant is discharged.

---

CONCURRING OPINION BY RHODES, P. J.:

I fully agree with the Court's opinion and the conclusion reached. However, I deem it advisable to refer to one matter which has not been discussed as the question was not raised. In order that the Court's opinion may not be misconstrued as a precedent, I think it appropriate to point out that this is a case which falls within the exception to the general rule that appeals cannot be taken in criminal cases prior to judgment of sentence or some other final disposition. An exception is made where the circumstances are unusual and justice requires the exercise of appellate review at an intermediate stage of the proceedings. See *Com. v. Fox*, 181 Pa. Superior Ct. 292, 295, 296, 124 A. 2d 628, and cases cited. In *Com. v. Trunk*, 311 Pa. 555, 565, 167 A. 333, 337, Mr. Justice SCHAFFER, speaking for the Supreme Court, said: "While it may be true generally that appeals may not be taken in criminal proceedings where judgment of sentence has not been passed, this rule should not be held one of universal application. There are instances where great injustice would thereby be done to defendants." Speaking of the exception to the rule that an appeal may be had only from judgment of sentence, President Judge KEL-

LER said, in *Com. ex rel. Paige v. Smith,* 130 Pa. Superior Ct. 536, 542, 198 A. 812, 815: ". . . The extent of that modification has not been exactly stated, but it should be applied to cases where the quashing of such an appeal might work injustice to the defendant."

In the present case, on bill of indictment No. 404 the court suspended sentence, ordered restitution to the Medical Service Association of $100, ordered defendant to pay the costs and $1,000 to the County of Philadelphia, and placed defendant on probation for two years. On each of the other bills sentence was suspended and defendant was ordered to pay the costs of prosecution and $100 to the Medical Service Association. Although no formal sentence has been imposed,[1] defendant on the record stands convicted of a felony. Substantive review of the record discloses that the convictions cannot be sustained under the Penal Code. A grave injustice to defendant would result if the appeals were quashed. Defendant would have felony convictions, admittedly invalid, remaining indefinitely upon the record. All the convictions were properly considered on the merits and reversed. Defendant was thereupon discharged.

The present case is to be distinguished from *Com. v. Elias,* 186 Pa. Superior Ct. 137, 140 A. 2d 341, where we quashed the appeal from a suspended sentence, as no injustice thereby resulted to defendant. The same is true of *Com. v. Heintz,* 182 Pa. Superior Ct. 331, 337, 126 A. 2d 498. In both cases we reviewed the record.

---

[1] See *Com. v. Moore,* 172 Pa. Superior Ct. 27, 92 A. 2d 238; *Com. ex rel. Kosele v. Keenan,* 178 Pa. Superior Ct. 461, 116 A. 2d 314.