# Commonwealth *v.* Byers, Appellant.

*Criminal law—Evidence—Circumstantial evidence—Presumption of innocence—Question for court—Incendiarism.*

1. When a crime charged is sought to be sustained wholly by circumstantial evidence, the hypothesis of guilt or delinquency should flow naturally from the facts and circumstances proved, and be consistent with them all. The evidence of facts and circumstances must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed, or in other words the facts and circumstances must not only all be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence.

2. It is the right and duty of the trial judge, after the evidence of the commonwealth has been fully produced, to determine as matter of law, whether the proof has been sufficient in volume and quality to overcome the presumption of innocence, and thus put the accused to a defense. Where the proof fails to measure up to this standard there is nothing to support a conviction and the prisoner is entitled to be discharged.

3. The conviction of an elderly woman on an indictment for burning a barn will be set aside by the appellate court, where there is no sufficient evidence of motive, and the circumstantial evidence produced is not inconsistent with the prisoner's innocence.

Argued Oct. 5, 1910.   Appeal, No. 55, Oct. T., 1910, by defendant, from judgment of O. & T. Bucks Co., Nov. T., 1909, No. 28, on verdict of guilty in case of Commonwealth v. Maggie Byers.   Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.   Reversed.

Indictment for arson and for burning a barn.   Before STOUT, P. J.

The facts are stated in the opinion of the Superior Court.

Verdict of guilty, upon which the prisoner was sentenced to pay a fine of $50.00 and to undergo an imprisonment in the penitentiary for not less than two years and six months, and not more than ten years.

*Errors assigned* were various rulings on evidence and instructions.

*Harman Yerkes*, of *Yerkes, Ross & Ross*, and *John C. Swartley*, of *Swartley & Bunting*, for appellant.

*Wm. C. Ryan*, district attorney, for appellee.

OPINION BY HEAD, J., December 12, 1910:

There was no direct evidence in this case either to prove the corpus delicti or to establish any connection of the defendant with the assumed crime.   The learned trial judge correctly stated thus the rule by which the probative value of circumstantial evidence is to be measured: "When a crime charged is sought to be sustained wholly by circumstantial evidence, the hypothesis of guilt or delinquency should flow naturally from the facts and circumstances proved, and be consistent with them all. The evidence of facts and circumstances must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed, or in other words the facts and circumstances must not only all be consistent

with and point to the guilt of the accused, but they must be inconsistent with his innocence."

There is another important rule or principle characteristic of the administration of the criminal law in Pennsylvania. This declares it to be the right and duty of the trial judge, after the evidence of the commonwealth has been fully produced, to determine as matter of law, whether the proof has been sufficient in volume and quality to overcome the presumption of innocence, and thus put the accused to a defense. Where the proof fails to measure up to this standard there is nothing to support a conviction and the prisoner is entitled to be discharged. Dr. Wharton, Cr. Pl. & Pr., sec. 706, concludes his discussion of this rule in this language: "Unless there be a statute prohibiting this course, this is a necessary prerogative of the judge trying the case." So in Pauli v. Commonwealth, 89 Pa. 432, Mr. Justice PAXSON said: "This is not a question of the weight of the evidence, but of its sufficiency. We have no doubt that in favor of the liberty of the citizen the court may, and in a proper case should, declare the evidence insufficient to convict."

It is earnestly contended by the able counsel for appellant, that the learned trial court failed to apply the principles stated when he refused the motion, made at the conclusion of the evidence for the state, and permitted the case to go to the jury. If this contention be well founded, there will be no occasion to review the other questions raised by the record.

At the time of the fire which gave rise to this prosecution, Andrew Bonner was the tenant or occupant of the premises upon which was situate the barn that was burned. His daughter, a single woman of mature years, lived with him and managed his household, which at that time further comprised a foreman, Bush, a laborer, Quinn, and the appellant, an elderly woman who for a number of years had been their housekeeper. On the morning of the day of the fire, two loads of hay had been taken from the barn by two different men, and had been sent to Phila-

delphia, the foreman going with them. At about six o'clock of that evening, Miss Bonner, accompanied ·by· the appellant, took supper to her father, who was an invalid, confined to his room upstairs. They came down together, and Miss Bonner went to the sitting room and began to write a letter. The appellant went to the kitchen to complete her usual work. Quinn, the laborer, testified that about six o'clock he had left the barn, closed up as usual for the night, and came to the house and got his supper from the appellant in the kitchen. He then went to the cellar, and attended to the heater, went up to his room and got some clothing, which he intended to exchange at the store, and left the house. The exact time at which he left is not definitely fixed, but it must have been after half past six.

Within a very few minutes of the time he left, certainly before seven o'clock, the appellant came into the sitting room and informed Miss Bonner, who was quite deaf, that there was a fire. They went together to the porch, and discovered that the barn was burning. Miss Bonner immediately proceeded to the stable to try and remove the horses, and was followed in a few minutes by the appellant. She, in the meantime, had gone back into the kitchen and brought with her the butcher knife, which was used to cut the halter straps to free the horses. While in the stable, Miss Bonner remarked that she smelled oil, to which the appellant replied that she thought it was the paint. Having gotten one horse out, Miss Bonner says, that while she was trying to extricate a second, the appellant closed the stable door from the outside. They then labored together with the assistance of neighbors who began to arrive, to save other property in and about the barn, but were unable to control the fire, and the barn was consumed.

It further appeared that within some short period before this fire, other barns and buildings in that section of the country had been destroyed by fire, and there was considerable excitement in the community on the subject.

There was testimony that on several occasions the appellant and her mistress had some disputes concerning various matters, affecting the appellant's grown up daughter, who resided in the neighborhood, her nephew, who had formerly lived on this farm, and other like subjects. No one of them appears to have been at all serious, and certainly not sufficiently so to sever the relation which had so long existed between the two women. There was still further some little evidence that the appellant occasionally indulged in the use of intoxicating liquor, and had at such times used some intemperate language in relation to her mistress and the insinuations made by the latter. The evidence still further disclosed that on the next morning after the fire, the appellant said to Miss Bonner, "Place your hand on my head, and feel the heat." When asked what was the matter, the appellant made no answer. When some three weeks later, Mr. Bonner was able to rise from his bed, to go to the porch, and witness for the first time the ruins, his daughter and the appellant were with him, and the latter said to Miss Bonner, "My heart is in my mouth," and the reply was, "You are rather late thinking about it." This seemed to have disturbed the appellant, who a few moments afterward came to her mistress and asked what she meant by what she had said downstairs. She said, "Do you mean to say that I burned the barn?" I said, "No, Maggie, I did not say so, but we know who burned it." There were some other remarks of the appellant, made at widely different times, shown by the evidence, but they were less significant than those we have stated.

It will thus be seen that the commonwealth was compelled to rely, to establish the fact that there had been an incendiary fire, upon the assumption that because there was no one able to show how the fire actually occurred, it must have been incendiary. This assumption was strengthened by nothing else except what might be drawn from the statement of Miss Bonner that she thought she smelled oil. There was evidence that the man who

.closed the barn at six o'clock, smoked a pipe, although there was none that he smoked in the barn. He may have dropped a match or one may have been dropped by the men in the mow earlier in the day. Thus the fire might have been purely accidental, but because it could not be demonstrated that it was accidental, it is a long step to assume that it was incendiary and that a serious crime had been committed.

The commonwealth next relies on the proposition that the defendant had an opportunity to start the fire. The evidence to support this theory simply rests on the fact that for a few moments, prior to the discovery, no one saw her. There is not a particle of evidence that she left the house until after the fire had been discovered; there is none which shows that the fastenings of the barn, whatever they were, had been interfered with; there is none to show that there was any oil kept in the house to which she had access, nor, in a word, is there anything more to support the conclusion that she had an opportunity to commit the crime, than there would have been to justify the conclusion that Miss Bonner, herself, was connected with the crime, because she had a precisely similar opportunity.

Finally it is argued by the commonwealth, that the evidence showed a motive on the part of this defendant to commit such a crime. This alleged motive rested alone upon the insignificant bickerings between the defendant and her mistress to which we have referred. As a rule they showed but little more feeling on one side than on the other, and were wholly insufficient in our judgment to support the conclusion of guilt which the jury was permitted to draw from them. We are not to be understood as intimating that, under normal conditions, it is incumbent on the commonwealth, in order to make out a case, to prove the existence of any motive at all, much less of an adequate one. But where the fact that a crime was committed rests upon a mere inference not at all inconsistent with innocence; where the connection of the ac-

cused with the alleged criminal act is again but an inference born of the vaguest suspicions; and where both are sought to be strengthened by proving a motive something more than is shown by this record ought to be required.

There was, of course, no evidence that this old woman could have been in any way connected with the other fires which had occurred in the neighborhood, and it seems clear to us that, had it not been for the excitement in the community, caused by these fires, no jury would have convicted this defendant of a high crime and rested such a weighty verdict on the flimsy foundation supplied by the few facts and circumstances proven.

The ways of the human heart are unsearchable, and it is possible that this elderly woman, who had never before been accused of wrongdoing, committed this great crime; but if the rules and principles of law, to which we have adverted, are to be fairly administered, so that they may afford to an innocent defendant the protection they were intended to secure, there is, as we view it, no escape from the conclusion that the learned trial judge fell into error in refusing the motion that was made and in permitting the jury to convict.

The second assignment of error is sustained, the judgment is reversed, and the defendant is discharged without day.