Commonwealth *v.* Benz, Appellant.

Commonwealth *v.* Routley, Appellant.

466

Argued March 25, 1935.   Before FRAZER, C. J., SIMP-
SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Harry A. Estep*, with him *James T. Philpott*, for ap-
pellant, James E. Routley.

*John B. Nicklas, Jr.*, of *McCrady, McClure, Nicklas &
Hirschfield*, for appellant, Cedric C. Benz.

*E. T. Adair*, Assistant District Attorney, with him *An-
drew T. Park*, District Attorney, for appellees.

OPINION BY MR. JUSTICE KEPHART, April 15, 1935:
Defendants were charged with conspiracy to defraud
the County of Allegheny out of its funds or property by
the use of gasoline delivered to them for their personal
use and paid for by the county.   At common law, a crim-
inal conspiracy is an agreement between two or more per-
sons with criminal intent to do an unlawful act, or to do

a lawful act by unlawful means: Com. v. Richardson, 229 Pa. 609, 611. The indictment may be sustained under section 128 of the Criminal Code, as well as at common law. Conspiracy depends on the agreement and the criminal intent of the parties to the agreement to commit an unlawful act, not on the acts that follow; the acts when done are but evidence against the accused when the conspiracy is established (Newall v. Jenkins, 26 Pa. 159; 12 C. J. 543). The mere fact that the agreement has for its object the doing of an unlawful act does not amount to conspiracy unless the parties were actuated by criminal intent. The agreement itself must be corrupt. The agreement of the parties to get gasoline at the service station and charge it to the county would not amount to conspiracy unless it be shown that it was done with criminal intent to defraud the county. The agreement of the parties to use gasoline purchased by the county on automobile trips for their own personal benefit would not be conspiracy unless the parties were actuated by an intent to defraud the county. "To make an agreement between two or more persons to do an act innocent in itself a criminal conspiracy, it is not enough that it appears that the act which was the object of the agreement was prohibited. The confederation must be corrupt. The agreement must have been entered into with an evil purpose, as distinguished from the purpose simply to do the act prohibited, in ignorance of the prohibition. The criminal quality resides in the intention of the parties to the agreement, construed in connection with the purpose contemplated. The mere fact that the conspiracy has for its object the doing of an act which may be unlawful, followed by the doing of such act, does not constitute the crime of conspiracy, unless the jury find that the parties were actuated by a criminal intent": Com. v. Gormley, 77 Pa. Superior Ct. 298.

The charge of conspiracy is easily made. Mere suspicion and possibility of guilty connection is not to be received as proof in such cases: Benford v. Sanner, 40 Pa. 9.

A foundation must first be laid by proof sufficient to establish the unlawful agreement between the parties. The connection being thus shown, the subsequent acts in pursuance of that agreement are then original evidence against them. But, the subsequent acts are immaterial and are not competent unless and until the agreement be established: 1 Taylor on Evidence, section 590; 1 Greenleaf on Evidence, section 111. The gravamen of the conspiracy alleged lies in the agreement with criminal intent to defraud the county; failure to prove the agreement with such intent defeats the charge: Ballantine v. Cummings, 220 Pa. 621.

The following facts were developed in the Commonwealth's case: Routley, assistant chief clerk for the county commissioners, sometimes acting chief clerk, in 1928 ordered Benz, his codefendant, to issue orders to a gasoline station to take care of the delivery of gasoline to individuals who were then using their own cars for county purposes. Routley's car was among those so used. Benz, who was the chief clerk of the purchasing department (a separate department from the one in which Routley was employed), took the matter up with the chairman of the board of county commissioners, and received a confirmation of this order from the chairman; at the same time he was directed by the chairman to secure gas for his and Routley's car from the Peoples Service Station, and charge it to the county. No minute in the commissioners' minute book was made of this order. It was a verbal direction. It appeared that the expenses of other employees for gasoline were also paid for by the county, by orders of which no minute had been made.

In the spring of 1932, a change of administration in the commissioners' office occurred, and the new commissioners ordered a general audit of all the business affairs of the county for a number of years. They found that from 1928 to 1931 inclusive, there were nine county service stations owned by the county, and that, in addition, the county secured gas from independent retail dealers.

The Peoples Service Station was such an independent dealer, and had an annual contract with the county for gasoline. In the fall of the year, the various departments of the county would requisition gas for the following year. These requisitions were filed with the purchasing department which issued orders to the various gas stations to deliver gas. Certain of these orders were to take care of the delivery of gas to individual automobiles. The drivers receiving the gasoline signed delivery slips with the license number of the car driven. This was the sole evidence of delivery to any car. Payment was made by noting order numbers on invoices which were sent to the bureau of accounts, another department in the commissioners' office. Vouchers were then made up in payment of these invoices after audit by the controller.

Under these orders, gasoline had been secured from the Peoples Service Station by cars bearing the license numbers of Benz and Routley. Routley and Benz had accounts at this station prior to the time the orders were given to have their gas charged to the county, and when gas was delivered to these cars it was charged to them individually. The service station made no change in their accounts though it knew the gasoline was to be paid for by the county. The particular funds used to pay for gas oline secured by these cars were those of the North and South Parks; county orders in excess of their requisitions were issued and sent to the Peoples Service Station. Part payment for the gasoline delivered to the Routley and Benz cars was made by applying to their accounts certain order numbers allocated to these parks. Other payments were made in the following manner: In the late fall gasoline was purchased and paid for by the county for the several county departments; delivery was to be made during the early part of the year following. When deliveries were made under this arrangement, it was at current prices; these were usually less than the price paid in the fall of the year, and the accounts would show a credit balance in favor of the county. In some

cases these balances were credited to the defendants' accounts.

The auditors found from the delivery slips that the Routley car had been charged in four years with $1,426.97 worth of gas and oil, and Benz's car with $669.29. The service station books also showed gasoline and oil had been delivered to other persons, charged to these accounts and paid for by the county in a sum approximating $954.80.

Harris, the service station manager, testified that he received orders from Benz to charge gas furnished the Routley and Benz cars to the county. Instructions with regard to these transactions were received from Benz; Routley gave no instructions at all, and did not appear in the matter. Although Harris occasionally saw Benz getting gas at the station, he never saw Routley getting gas at any time, and the gas put in his car was always received by others who signed his name to the delivery slip. Harris stated that all bookkeeping arrangements were made by and through the bookkeeping department; Routley and Benz had nothing to do with that department. Benz did direct him how to make his charge against the county, that is, by indicating on the invoices the order number affected, the invoice being sent to the bureau of accounts. The method of payment was that when the accounts reached $100 or at the end of the month, invoices were made out and a park order number given on the invoices, these were sent through for payment; when invoices were lost Harris personally took them up with the accounting department, giving duplicates, if necessary. An employee of the controller's office verified the auditors statements as to method of payment.

Another witness for the Commonwealth was Barnett, a county employee who was at the head of some county drivers, and who had at different times assigned three or four drivers to use Routley's car on county business. Barnett stated that he had frequently driven Routley's car himself and had signed some of the delivery slips for

gas charged to Routley's account, but that he had never driven him personally. He said that he used this car to drive grand juries to and from their respective county visitations. He used it to go over road jobs; took persons connected with the Mothers' Assistance Board, investigating the homes of those applying for aid; took officers attached to the juvenile court on missions connected with their office; drove members of the county commissioners over road jobs; attended soldiers' funerals upon the orders of the commissioners, and drove the car about 14,000 miles on county business every year. He drove, or had driven, other cars on county business, mentioning that of a Mr. Ziefel.

The Commonwealth also placed in evidence a statement, signed by Benz, which, in addition to telling of the orders he had received from the county commissioner, detailed the method by which payment for the gas delivered to private cars was taken care of, by the custom prevailing for the use of future orders, the overpayments from which had been credited partly to the defendants' accounts; this method of obtaining gas was, he said, with full knowledge of the chairman of the county commissioners. He also stated that he realized this was wrong, later explaining that by this he meant the method or practice of purchasing and paying for gasoline before delivery.

At the conclusion of the Commonwealth's case, the sum of the testimony was that gasoline supplied to the cars of both defendants was paid for by the county on the orders of the chairman of the board of county commissioners, which orders as to Routley's car, were communicated by him to Benz. There was no evidence as to the use of the gasoline except Barnett's, and his testimony showed it was for the county. Payments were all conducted through the controller's office and the bureau of accounts. The individual accounts were open upon the books of the service station. Any person with authority could see them if they desired. Gasoline supplied to

other cars was charged to these accounts without the knowledge, consent or approval of either defendant.

The Commonwealth thus failed to show any combination, certainly failed to prove an unlawful combination, and such failure defeats the conspiracy alleged. An unlawful combination, like any other substantive fact, must be established by sufficient evidence. Where it is direct and positive, the question of sufficiency is answered. The jury may then pass on the credibility of the witnesses. But, when a charge of crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved, and be consistent with them all. The evidence must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence: Com. v. Bone, 64 Pa. Superior Ct. 45; Com. v. Byers, 45 Pa. Superior Ct. 37; Com. v. Kolsky, 100 Pa. Superior Ct. 596. It is the duty of the trial judge, after the evidence of the Commonwealth has been fully produced, to determine as a matter of law whether the proof has been sufficient in volume and quality to overcome the presumption of innocence, and thus put the accused to a defense: Com. v. Bone, supra.

Here the evidence to connect the appellant, was wholly circumstantial. The facts which may be inferred from it did not exclude, to a moral certainty, every hypothesis but that of guilt and are not inconsistent with his innocence. It follows the evidence was insufficient to establish guilt (Com. v. Kolsky, supra), but, as stated, there was not a scintilla of evidence to establish an agreement. There was no attempt to hide the transactions. The books of the service station plainly showed every step, and when the invoices were presented to the county for payment, the county controller could very easily have ascertained all the facts in connection with it, and it was his duty to do so, and, moreover, the presumption is that he did so:

Skelton v. Lower Merion Twp., 318 Pa. 356. No effort was made to dislodge this presumption, that in effect certified the correctness of these accounts as proper county charges. The controller was not called as a witness. Had these deliveries been charged directly against the county, through these two parks, the defendants names not appearing on the books, it might have been very difficult to have traced them, but here they were openely charged against the defendants and the conclusion is obvious.

By the Commonwealth's own evidence, "every act of the defendants was consistent with innocence; there was not a scintilla of evidence to support either the allegation of an agreement or confederation of these defendants to defraud the county, or even of any agreement at all, nor was there any testimony sufficient to warrant an inference of an agreement; the Commonwealth not only failed utterly to show that the gas supplied to these cars was used generally for private purposes, but on the contrary the only evidence of use showed that it was for county purposes." Defendants should have been discharged.

The fact that orders or instructions given by the chairman of the board of county commissioners were not noted on the minutes is not sufficient to show an unlawful agreement; certainly the evidence that the crime charged was done in obedience to the instructions of executive officers negatives the existence of criminal intent. These defendants should not be held criminally liable because the chairman failed to have a minute made of his order. The failure to cause a minute to be made might become important had the service station sued the county for purchase price of the gasoline, and then it would be very questionable whether with the multitude of minor affairs, in large counties such as this, attending the commissioners' office which must be immediately performed, it is necessary to cause a minute to be made of every single order of that body. It would be impossible to perform

county duties properly if a minute were required on the giving of every minor order. In country counties, at every session of the courts, the grand juries must visit the county homes, children's homes, insane asylums, if any, and the county jail. An order is given to supply automobiles for that purpose. This is an illustration of one of the very many duties that the county is called upon to perform immediately, and the authority to provide for the execution of such minor duties should be and logically is in the chairman of the board. It is an incident of the office.

The fact that the funds were taken from the North and South Park is of no significance. Those having knowledge of county affairs know how frequently funds are transferred from one fund for use in another, or bills paid from different funds when the correct one happens to be short at the time; this was a matter for the county authorities.

The trial judge considered the evidence sufficient and submitted it to the jury. We have seen that the Commonwealth's evidence was insufficient to support a conviction. The inquiry then is whether its case was aided by the defendants' evidence? Was there anything on the defendants' side that exposed a criminal conspiracy or that would subject them to penalties for fraudulent use of county moneys? From the testimony presented by defendants it appeared that Routley had been in public life twenty years, and Benz since 1922. During the years in question, in addition to many other activities carried on by Allegheny County, a large improvement program, amounting to approximately $72,000,000, was in progress. It was necessary for the county to use a number of automobiles in addition to those owned and used by the county for its purposes. Cars were assigned to superintendents, foremen, and others engaged in this work, in addition to county officers, district attorneys, sheriffs and others. When cars were necessary for extra work or em-

ployment by the county, private automobiles were secured and cars belonging to county employees were used.

The fact of Chairman Armstrong's orders were testified to by both defendants. In directing Benz to secure gasoline at the Peoples Service Station, Armstrong stated that he wanted them (the defendants) to secure the gasoline there as he did not want employees in other offices, who might think they were entitled to gas, to bother him about it, and he did not want anybody to get gas from this station from any office other than through the order he had thus given. He directed that the payments should be made from the North and South Park Improvement Fund, as they had more funds on hand than the county road fund or others that could have been charged with these accounts. These orders were given in 1928.

It also appeared that this same station had furnished gasoline to others, and as we read the record in the Commonwealth's case, some of these deliveries were also charged to the defendants' accounts. The director or superintendent of the parks knew of the instructions which Armstrong had given to supply defendants' cars with gasoline and charge it to the county. The payment on monthly invoices was all covered by orders drawn against the North and South Park Funds.

Routley and Benz testified that they knew nothing about the gasoline that had been furnished to others and charged to their accounts by the service station. Benz discovered it later and protested against the unauthorized charge and the service station discontinued it.

There was voluminous testimony as to the use of these cars for county business. It is unnecessary to repeat it. Routley's car was driven many thousands of miles and it was stated at the argument that the average use of his car to and from his home or on personal errands ran about $14 a year. There was no other testimony as to personal use and very little as to Benz's car. This, in substance, is the defendant's testimony, omitting the vast amount of detail as to county use that we have noted.

From the above it clearly appears that defendants' case contained no evidence to show conspiracy or a fraudulent use of the gasoline in question. Their testimony instead of strengthening Commonwealth's case, showed an entire absence of criminal intent. The transfer of credits, so much discussed, was to be expected where gasoline was bought and paid for in advance with later deliveries carrying a lower price. Under this method of purchasing, the credits must be applied somewhere; it would have been better to have refunded in cash, but that was a matter between the station and bookkeeping department. It was bad practice for the county to purchase and pay for future supplies of gasoline before it received the goods. Public officers cannot ordinarily do this, but the mistake was not Routley's or Benz's—it was a general custom, as shown by the Commonwealth's evidence. The passing of the credits used in connection with this practice could have been traced by the controller's office had the least effort been made, as the credit should also have appeared on the county's books, as well as on those of the service station. As stated, in passing these accounts, the controller certified as to the proper application of credits. The incident as thus disclosed does not even indicate a corrupt agreement or criminal intent.

It is urged that the employees of North and South Park did not know of Armstrong's orders to defendants to get gasoline; it was not necessary for every employee of these parks to know about these orders. It was necessary for the director or superintendent to know, and the evidence showed that they did know. The argument that the defendants should be convicted of fraudulent use of gasoline or of a conspiracy to defraud the county because they occasionally used the cars to go to and from their homes or on an errand of their own, is without merit. "The general use of automobiles in connection with all business, public and private, has given them a status with regard to employees that makes the occasional use an incident of employment. At least, such use does not war-

rant a finding of criminal intent or of fraudulent use and conversion of so much of the owner's gas as is necessary for the trip. It carries the doctrine of conversion or fraudulent use much too far. Were the argument sound, then when an officer, employee, chauffeur or the like, whose duties require him to drive his employer's car, uses it on a minor errand of his own, such use is a fraudulent use or conversion of the owner's property and of the gasoline in the car, and such officers or employees whether in public or private positions, are guilty of a criminal offense. Of course this is not the law. A chauffeur who uses his employer's car on errands of his own, is not a criminal by such use, neither is the officer who so uses the company car, nor is a public officer."

Relative to the gasoline furnished to the wife, daughter and son of one of the county commissioners, and charged to one of the defendants' accounts, these transactions show a vicious practice, but it shows how easily a county may be defrauded by a retailer in this or any other goods where the purchasing and bookkeeping is carried on as this was. There is not a scintilla of evidence that either of these defendants knew anything about this, except, as we have stated, that Benz, when he found it out, protested and the practice was discontinued.

"We cannot escape the conclusion that the Commonwealth utterly failed to produce any evidence of a conspiracy, or which tended to show fraudulent conversion of gasoline, or misappropriation of funds of the county."

The judgments of the court below are reversed, and both defendants are discharged.