Commonwealth *v.* De Petro, Appellant.
Commonwealth *v.* De Petro (et al., Appellant).

536

Argued November 8, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*Donald B. Hirsch,* with him *Charles J. Margiotti,* of *Margiotti, Pugliese & Casey,* for appellants.

*John M. Bennett,* Assistant District Attorney, with him *Stephens Mayer,* District Attorney, for appellee.

OPINION BY BALDRIGE, J., March 15, 1944:

These two appeals were argued together and will be disposed of in one opinion.

James De Petro was indicted (No. 19 December Term, 1940) charged in the first count with the offense of arson and in the second count with burning a building to defraud the insurer. Verna De Petro and Anthony Montonaro were indicted (No. 20 December Term, 1940)

and also charged in two counts with arson and burning a building to defraud the insurer. They were all tried together as the alleged offenses had their origin in one fire and were convicted as indicted. James De Petro and Anthony Montonaro were given prison sentences and thereafter they took appeals. Verna De Petro was given a suspended sentence.

In view of the questions raised in these appeals it will be necessary to state in some detail the facts. On the night of July 5, 1940, a frame dwelling house owned by James and Verna De Petro, located in the Borough of Barnesboro, Cambria County, was totally destroyed by fire. James De Petro was in attendance at a firemen's convention held in Punxsutawney when the fire occurred, and his five children, ranging in age from 9 to 14 years, were also absent from home. There is some conflict as to what transpired in the house just before the fire. Montonaro testified that he had left his home, which was in the neighborhood of the De Petro home, to look for his young daughter; that as he passed the De Petro house he saw through the window what appeared to be a flame. He ran around to the back porch, attempted to open the rear door, which did not yield, and then he "hit it" with his shoulder and fell to the floor when the door opened suddenly. The flames immediately burst out and enveloped him. At that moment some unidentified person ran past him and with difficulty he got out of the house, but not before he was very badly burned over his back, face, and arms.

Officer McAllister said that Montonaro told him that he and Mrs. De Petro had been playing cards until about 10 o'clock when he went to the kitchen to get a drink and while there something exploded and that he did not remember thereafter whether he walked, or was blown out, of the house. When his attention was called to those statements they were denied.

County detective Cowan said that Mrs. De Petro at

the hospital the next morning told him that the defendant, Montonaro, and she were in the house playing cards at the time of the fire; that Montonaro went to the kitchen and some 5 or 10 minutes thereafter there was an explosion; that he was blown from the kitchen into the dining room where she was. She denied making those statements.

She testified that she was lying down upstairs and heard a noise. She then arose came downstairs, and "I stood in the hall and the flames was coming out of there something awful, and I ran down to the head of the stairs, and that part was all on fire. I kept right on going sideways. I got into the dining room, and kitchen, and when I got to the kitchen as far as the door, I couldn't go further, and I made a grab for the door knob and I just didn't have the power; I was too weak to open the door. I stood there in a daze, or whatever it was, I don't know, and then the door flew open and I got the air."

Admittedly Mrs. De Petro and Montonaro were badly burned and were found wandering in the alley in the rear of the De Petro house immediately after the breaking out of the fire. They were taken to the hospital where they had to remain a number of weeks.

Some of the neighbors in describing the fire said they heard a noise like a "bump" and others said an explosion occurred in the house, followed by a burst of flames all over the building; that the flames were of a bluish white color, very hot, and accompanied by a roaring noise, indicating the presence of inflammables. When Mrs. De Petro was being taken to the hospital in an automobile she kicked off her shoes and a number of witnesses testified that these shoes smelled of gasoline that night. A chemist testified that shortly after the fire he discovered traces of gasoline on the shoes. He explained the tendency of gasoline vapors to explode and when that occurs it is followed by a hot, fast fire with flames of a bluish white nature. This witness

also testified that he had examined the coat worn by Mrs. De Petro some days after the fire and found no odor of gasoline on it, which was not unexpected because of the volatility of gasoline, but that a microscopic view of the area burned showed that the top of the fibres were scorched due to a quick flame, which did not burn deeper than the exposed fibres; that it was a different result than would have followed an ordinary burn. A nurse in the hospital, who attended Montonaro the night of the fire, said she smelled gasoline on his clothes. There was evidence also that among the ruins were found two 5 gallon tin cans, which were thoroughly burned both inside and out. De Petro attempted to account for the presence of the cans by stating that they had been used for alcohol for his truck during the previous winter. There was no evidence of any fire having been in the house on this warm summer evening. Nor was any explanation given of the origin of the fire upon the part of the defendants.

The Borough of Barnesboro maintains two pieces of fire apparatus, one a Seagrave pumper and the other, an older one, is a Stutz pumper. On the night of the fire the more modern pumper was in a firemen's parade in Punxsutawney. When the alarm was given volunteer firemen responded, taking the Stutz apparatus and an attempt was made to pump the water from a creek nearby to the burning building. For a short period this pumper worked perfectly and then suddenly it ceased to function. It seems that the Stutz machine had been used successfully on July 2, three days previously. The day following the De Petro fire an examination was made of the suction hose of the pump used wherein it was found that there were some pieces of lamp wick of the kind used in oil stoves which prevented the water from being pumped out of the stream. There was a screen with small holes at the intake of the hose and an additional one where connection is made with the pump. These screens prevent foreign matter from being

sucked in and interfering with the action of the pump. The commonwealth contends that this foreign matter could not have entered the hose through the screens and was maliciously placed there by someone. The appellants complain of the admission of this evidence, but we think that was a matter for the jury's consideration.

H. D. Plouse testified that he was in charge of the fire apparatus and that on July 5 De Petro seemed to be keenly interested in the time he was going to Punxsutawney, the truck he was taking, the route he intended to follow each way, and the length of time he would be absent from Barnesboro; that De Petro talked with him at least four times that day and on each occasion he persistently repeated in substance these inquiries. He told De Petro that he would be leaving about 6 o'clock and that he intended to take the Seagrave truck. De Petro denied having the conversations testified to by Plouse. He said he left his home about 5:30 P. M. that day, went to Punxsutawney, and did not get home until after his house had been consumed by fire.

The Commonwealth alleges that De Petro was in financial distress, threatened with foreclosure of a $500 mortgage owned by a building and loan association; that a furniture company was about to repossess the furniture previously purchased and that the First National Bank held his note in the sum of $722.10 given to purchase an automobile; that he owed a plumbing bill of $110.55 and he was indebted to a roofing company for materials amounting to $250.33. There was evidence that this house was worth about $1,500. It had been purchased by De Petro in 1934 for $300, but in the meantime he had made a number of improvements. There was a total insurance on the real estate of $1,600 and on the personal property of $1,000, $500 of which was taken out nine days before the fire.

The appellants argue that the evidence, entirely circumstantial, was insufficient to warrant a conviction in that there was no proof (1) that the fire was of an

incendiary origin; (2) that they were in any way connected with the fire; and (3) of any motive for their committing the crimes with which they are charged.

We find no difficulty in concluding that there was ample evidence of an explosion. Not only was the report heard by different people, but the color of the flames, the intense heat, the rapidity with which the fire spread and the force that accompanied it, the severity of the burns suffered by Mrs. De Petro and Montonaro, all indicate that this was not an ordinary fire. The rapidity with which the fire spread can only reasonably be attributed to the presence of gasoline or some inflammable substance. Moreover, as has been previously stated, there was testimony of the presence of gasoline on the clothes of Mrs. De Petro and Montonaro, which were important factors. No other reasonable explanation was given for the fire from the record before us other than there was an explosion and it could be reasonably inferred that it was the result of criminal conduct. The jury was, in our opinion, warranted in concluding that this fire was of an incendiary origin. If that be so, who were the guilty parties? The only persons in or near the house were Mrs. De Petro and Montonaro. Their contradictory statements concerning their conduct just before the fire, etc. were for the jury's consideration. Evidently it did not accept as true their assertions of innocence. The actions of James De Petro on the day of the fire would tend to arouse one's suspicions. We see no reason for Plouse to falsify in regard to De Petro's visiting him three or four times that afternoon and questioning him as to his plans. There is no evidence that he was unfriendly in the slightest degree to De Petro. The jury apparently accepted his testimony as true. If James De Petro was not guilty of criminal conduct in connection with this fire, what reason had he for not telling the truth concerning these inquiries? It is easy to understand why the jury would disregard his testimony and conclude that he par-

ticipated in sabotaging the pumper and that the three defendants in the court below were parties in causing this incendiary fire. We think, also, that the testimony upon the part of the commonwealth was sufficient to show that there was a motive for the commission of these crimes with which the defendants are charged, in view of the pressing demands being made by the creditors of James De Petro. Although the insurance did not appear to be greatly excessive, there was sufficient evidence to establish that the property burned did not have the value of the amount of the insurance.

While there was no evidence that Montonaro had any financial interest in the property that was not necessary as the relation between the parties was sufficient to connect him with the motives of James and Verna De Petro: *Commonwealth ex rel Guiffrida v. Ashe,* 137 Pa. Superior Ct. 528, 530, 10 A. 2d 112. The theory of the commonwealth was that he was aiding and abetting his relatives, the owners of the property, who had a motive because of their financial difficulties, and that his interest in the premises or the insurance was not essential to a conviction for either arson or attempting to defraud the insurer. Concededly, motive is an important factor, although it is not absolutely an essential element to prove one guilty of crime. We stated in *Commonwealth v. Byers,* 45 Pa. Superior Ct. 37, 42: "We are not to be understood as intimating that, under normal conditions, it is incumbent on the commonwealth, in order to make out a case, to prove the existence of any motive at all, much less of an adequate one." See also, *Commonwealth v. Pane et al.,* 110 Pa. Superior Ct. 367, 372, 168 A. 510. The testimony offered upon the part of the commonwealth, taken in its entirety, was of a sufficient damaging character to convict these defendants: *Commonwealth v. Friedman,* 100 Pa. Superior Ct. 164, 169.

No question was raised as to the adequacy of the judge's charge. He affirmed points submitted by the

defendants respecting the burden upon the commonwealth to prove their guilt beyond a reasonable doubt and the proper test to be applied where the commonwealth relied entirely upon circumstantial evidence. It is true that some of the circumstances upon which the commonwealth relied were not in themselves very strong, but when all the evidence is taken together, as the court below pointed out, they assume larger proportions and help to forge the chain of circumstances, which evidently convinced the jury of defendants' guilt.

This court, speaking through President Judge KELLER, in *Commonwealth v. Marino,* 142 Pa. Superior Ct. 327, 16 A. 2d 314, where the commonwealth relied entirely upon circumstantial evidence, said that the rule relating to circumstantial evidence laid down in *Commonwealth v. Byers,* supra, places too heavy a burden on the commonwealth as thereunder the jury must be satisfied with the guilt of the accused beyond any doubt, rather than beyond a reasonable doubt, and suggested the following modification: "When a crime charged is sought to be sustained wholly by circumstantial evidence, the circumstances proved should be such as reasonably and naturally to justify an inference of the guilt of the accused, and should be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt." That modification has been apparently approved by the Supreme Court of *Commonwealth v. Libonati,* 346 Pa. 504, 508, 31 A. 2d 95. See, also, *Commonwealth v. Du Boise,* 269 Pa. 169, 174, 112 A. 461; *Commonwealth v. Giovanetti,* 341 Pa. 345, 359, 19 A. 2d 119; *Commonwealth v. Johnson,* 153 Pa. Superior Ct. 437, 34 A. 2d 170. In the recent case of *Commonwealth v. Meyers,* 154 Pa. Superior Ct. 8, 11, 34 A. 2d 916, Judge RENO, the opinion writer, said: ". . . . . . the burden resting upon the Commonwealth to prove its case beyond a reasonable doubt does not require it to demonstrate the utter impossibility of innocence."

"Circumstantial evidence is, in the abstract, nearly, although perhaps not altogether, as strong as positive evidence; in the concrete it may be infinitely stronger." *Commonwealth v. Harman,* 4 Pa. 269, 271. The *Harman* case was cited with approval in *Commonwealth. v. Karmendi,* 328 Pa. 321, 195. A. 62, wherein it is stated pp. 333, 334: "There is no general rule to determine the quantity of circumstantial evidence necessary to overcome the presumption of innocence and carry the case to the jury. This must be weighed by the trial judge."

The appellants rely principally upon *Commonwealth v. Pogach,* 119 Pa. Superior Ct. 510, 180 A. 126, where we held that the evidence was insufficient to support a conviction. That was a close case. There was a serious question whether the fire was of an incendiary origin or caused by a spark from a hot air furnace and there was no proof that the defendant was in financial difficulties or that he was over insured. Other unusual circumstances were present that also distinguished it from this case. After a careful consideration of all the evidence we cannot say that it is "so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances." *Brown v. Schock,* 77 Pa. 471, 479, Sec. also, *Commonwealth v. Skwortzo,* 113 Pa. Superior Ct. 345, 348, 173 A. 480.

The judgments are affirmed, and it is ordered that the record be returned to the court below and that the defendants appear in that court at such time as they may be ordered and be committed until their sentences be complied with or so much thereof as had not been performed at the time when the appeals were made a supersedeas.

KELLER, P. J. and RHODES, J., dissent.