Commonwealth *v.* Mittelman et al., Appellants.

Argued November 15, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*Otto Kraus, Jr.,* with him *J. Franklin Nusbaum,* for appellants Nos. 179 and 180.

*Stanley W. Root,* with him *Leonard L. Ettinger,* for Appellant No. 181.

*Raymond V. John,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY KELLER, P. J., April 11, 1944:

Benjamin Mittelman, appellant in No. 179, Harry Sinkow, appellant in No. 180, and Sidney Saffian, appellant in No. 181, were indicted along with Samuel Lustgarten, Louis Mittelman and Theodore Williams

on two bills. One charged the defendants jointly with setting up, opening and maintaining a lottery. The other charged them with conspiring with each other, and with divers other persons unknown, to set up, open and maintain a certain lottery and sell lottery tickets thereof, etc. All the defendants were acquitted on the bill charging the setting up and maintaining a lottery; one (Lustgarten) on a plea of *former conviction*, others by direction of the court for lack of sufficient evidence, still others by the finding of the jury. On the conspiracy bill, the three first above named defendants were found guilty and sentenced. They have severally appealed from their respective judgments.

The projected enterprise or operation was unquestionably a lottery. Judged by any standard of definition— see *Com. v. Banks*, 98 Pa. Superior Ct. 432, 435-438; *Com. v. Lund*, 142 Pa. Superior Ct. 208, 213, 15 A. 2d. 839—it came within the provisions of the Penal Code[1] declaring lotteries—without defining them[2]—to be common nuisances, and providing that "whoever ...... erects, sets up, opens, makes or draws any lottery, or is in any way concerned in the managing, conducting or carrying on of the same is guilty of a misdemeanor"; and makes it the same grade of crime, with like penalty, for any one to sell, expose to sale, barter or exchange, any lottery ticket or other device purporting or intending to entitle the holder or any other person to any prize drawn in any lottery, or to advertise or publish in any newspaper, magazine or periodical any advertisement of any lottery ticket, lottery drawing or lottery scheme whatsoever. Hence it was not necessary, or even desirable, that the court should attempt to define to the jury "all the different schemes that ingenuity

---

[1] The Penal Code of 1939, P. L. 872, sections 601, 602.

[2] See *Seidenbender v. Charles*, 4 S. & R. 151, 162, 163, 164, 167.

might devise"[3] that are comprised within the term 'lottery'. It is enough that they were instructed that the projected scheme, as it appeared in the case then being tried, was a lottery.

The plan was to sell tickets at 50 cents each, entitling the lucky holders to prizes ranging from one dollar to one thousand dollars, based on the first four base ball games of the World's Series of 1940—between the champions of the American League and National League teams, respectively. Each ticket contained a lottery number or 'win' number of five digits, intended to represent the box score of (1) Runs, (2) Hits, (3) Left on base, (4) Times at bat, (5) Assists, of one of those base ball teams during the first four games of the World Series of 1940, in the following order: 1st game, American League; 2d game, National League; 3d. game, American League; 4th game, National League. If any of the box score numbers had more than one digit, only the last one was to be used. For example, if in the first game of the series the American League Team had the following box score:

| Runs | Hits | Left on base | Times at bat | Assists |
|------|------|--------------|--------------|---------|
| 4 | 7 | 3 | 42 | 6 |

the winning number would be 47326, and the holder of the ticket bearing that lottery or 'win' number would be paid $1000; while the holders of the tickets bearing one number above and below, viz., 47327 and 47325, would each receive $100, etc. In order to prevent counterfeiting and the use of spurious tickets, each ticket, in addition to its lottery or 'win' number, had also printed on it an *office* number known only to the lottery managers, and any one having a ticket bearing the winning number would be paid the prize only if

---

[3] Chief Justice TILGHMAN in *Seidenbender v. Charles*, supra, 4 S. & R. p. 162.

the ticket also bore the correct *office* number corresponding to the winning number on the lottery managers' 'win strip' or list. Before sale the tickets were folded a couple of times and clamped together with a metal fastener having two octagonal disks joined with a crosspiece, like a miniature spectacle frame, and securely stapled on the ticket in such a way as to prevent the numbers inside being visible or the ticket being opened unless the metal clamps or staples were *cut off*. The clamp or staple was one inch long—practically the width of the folded ticket—each octagonal disk being about three-eighths inch by three-eighths inch and the connecting cross piece being one-quarter inch long by one-eighth inch wide. When fastened it had roughly this appearance on one side, and two sets of four clamps around a circular depression like this on the other. The evidence reveals no purpose, other than to fasten such tickets, for which they could be used. The lottery tickets for the World Series games were known as "The Champion 1940"—but they had printed on them "Premiums guaranteed by Empire P.O.A.[4], Peoples Club, Old Reliable, Colonial", which tended to show they were all under one and the same management—essentially one business. In fact, the defendant who was ordered acquitted of the lottery charge on the ground of "former conviction", Lustgarten, had been convicted in Bucks County of participation in an 'Empire' lottery, based on the last five 'dollar figures' of the United States Treasury Daily Balance as published in the New York papers. The Champion tickets were seized by the police before they had been folded and clamped together and made ready for sale, which probably accounts for the jury's

---

[4] Initials for Pool Owners' Association.

acquitting the defendants of setting up and maintaining a lottery.

Mittelman conducted a printing establishment at 922 Filbert Street, Philadelphia. His connection with the conspiracy was that he printed the lottery tickets, the advertisements or announcements of the lottery, in the form of hand bills, and the win sheets or strips necessary for conducting the lottery. The lottery or 'win' numbers were printed in red and by a specially devised machine each number was spelled out under the figure, e. g.,

7    2    3    0    4

SEVEN   TWO   THREE   CIPHER   FOUR

so as to prevent alteration. The office numbers, which were also inserted in the 'win strip' were printed in blue on the opposite side of the ticket, but the ticket would be folded so that when clamped or stapled, no numbers at all were visible. Mittelman testified at the trial that he received the order for the printing from Sinkow, who also furnished the special numbering machine or machines used to imprint the 'win' number. Mittelman said he and Sinkow themselves did the actual printing of the tickets and announcements found, on Friday night, all day Saturday and Sunday morning, although the same announcements were found by the police at Harrisburg. When the police raided Mittelman's place on the Monday morning following, they found, inter alia, thousands of unbound or unfastened 'Champion' lottery tickets concealed at the bottom of an elevator shaft, and thousands of advertisements or announcements of the 'Champion' lottery which explained the scheme, announced the prizes and the method of determining the winners, some fully set up printing plates, indicating that the tickets and advertisements had been printed there, a type plate fully set up to print 'win sheets' on an 'Empire' lottery and a book or pad

of 'Empire' agents' report sheets, and a special numbering machine, as above referred to. Mittleman admitted to the officers that he knew the tickets were lottery tickets. The hand bills printed by him advertised the lottery and named the prizes and how the winners were to be determined, which was wholly by chance. But Mittelman said he did not know if it was legal to print the tickets, etc., or not, so he went to one of the largest printing houses in Philadelphia and spoke to the manager, and as a result of his inquiry, he proceeded with the work. He was not permitted to give further details of his inquiry and properly so. He admitted to the officers that he knew it was illegal to *sell* lottery tickets. He must have known that lotteries were illegal and that the carrying on of a lottery was a crime or misdemeanor. One engaged in assisting or furthering a project or scheme declared by statute to be a crime or misdemeanor cannot escape his criminal responsibility by saying that he did not know it was a crime to do so. An engraver, who at the request or employment of another, makes a plate to be used in the manufacture of counterfeit money, cannot free himself from guilty responsibility by saying, "I did not know if it was legal or not and I made inquiry of a large firm of engravers and then proceeded with the work". Inquiry of a lawyer, even, does not relieve one of responsibility for committing a crime: *Weston v. Com.,* 111 Pa. 251, 254-5, 273-4.

Sinkow was arrested at his home. A search of the house revealed a mechanical numbering set similar to the one or more seized at Mittelman's establishment, which were used to number the lottery tickets. He admitted to the officers that this was an extra machine. He also admitted to the officers, after being advised by them that his telephone calls both in and out indicated that he was in frequent contact with agents in the state, that this was so, and said, "My place is the office." He

said that when an agent runs out of tickets he [that is, the agent] calls in there; if an agent that was "hooked up" with him phones in to verify a "hit" he [Sinkow] verified the "hit" by comparison with the office strips and numbers phoned in, to protect the office from a "bum hit".

Saffian's establishment, located at 1344 Carpenter Street, Philadelphia, run under the name of the Atlas Ticket Company, had been for some time under surveillance by the police authorities, who had observed the operation of the punch machine which stamped out the metal clamps, described above, used to staple or fasten together the lottery tickets, so as to prevent the numbers being seen. It was raided a short time after the raid on Mittelman's place, near the end of August, 1940. A large quantity of processed or perforated steel tape—208 rolls, approximating ten tons—was seized there, which was identified by officers, by means of marks and imperfections in the dies, etc., as being exactly the same tape used in stapling the 'Empire' tickets which had been purchased in various sections of the Commonwealth, and which had been seized from Williams and Lustgarten (co-defendants in this case) when arrested in Bucks County. The officers knew of no other use to which it could be put. When asked by them what the tape was used for, Saffian replied, "You have been watching this place long enough; you should know what it is." Saffian had been observed unloading a number of rolls of this processed or perforated steel tape—about twenty-four rolls—at an automobile service station at 42nd and Chestnut Streets, where it was picked up and taken away within five or ten minutes by Theodore Williams, a co-defendant, who successfully eluded the officer who followed him. He had also, under a fictitious name or names, made shipments of the same tape, which he failed to claim when it was subsequently returned as undelivered. The police also found there a stamping

machine and an extra die set when they went to his place following his arrest on August 26, 1940.

Neither Sinkow nor Saffian took the witness stand to deny any of their statements, as testified to by the officers on the trial.

The trial judge correctly charged the jury that a "conspiracy is an agreement, a confederation, or a combination, between two or more people, with criminal intent or corrupt motive, to do an unlawful act. There has to be a criminal intent, a corrupt motive." He went on to say that when the object of the conspiracy is *to commit a crime*—and that setting up a lottery was a crime—the criminal intent is present, provided the defendants knew what they were doing. He continued, "It is no defense for any defendant to come in and say, 'I was printing lottery tickets, I was doing this, that, or the other with lottery paraphernalia, but I *didn't* know that was a crime'. That is no defense . . . . . However you've got to know specifically—these defendants must be shown to have known that they were dealing in lottery material. Did they know? Therefore, you could find the criminal intent if they knew the purpose of what they were doing was creating material for the lottery". He continued, "It wasn't necessary, either, that the act was carried through. Here the Commonwealth would like you to believe that there was a lottery going on, that it had been set up. The officers got the tickets and so on before it could get out on the street, but that doesn't make any difference . . . . . If these men, by their actions conspired to set up this lottery, even though the lottery wasn't put on the streets and sold and completed and paid off and all the rest of it, they would still be guilty of conspiracy to set up a lottery. The conspiracy, in other words, is complete when the agreement has been reached." He further correctly told the jury that they could infer the agreement from circumstances. The

law permits circumstantial evidence just as well as it permits direct evidence. After giving an example of direct evidence, where a witness tells what he saw with his own eyes, he went on: "But that isn't always the case. You can't always prove things that way and sometimes, as in a case of this kind, where there is no way of proving the contract—it wasn't written down somewhere, and nobody heard these people get together and make the contract between them, either in writing or orally— then you can resort to circumstances and tell from those circumstances what this agreement must have been." [5]

Then he went on and charged the jury as follows: "The law says there are certain things to watch about circumstantial evidence. We can't let the jury guess; circumstantial evidence has to exclude, to a moral certainty, every theory except that of guilt. That theory has to flow from the proved facts and circumstances and be consistent with them all. And those facts and circumstances must be consistent alone with guilt and inconsistent with innocence."

This was more favorable to the defendants than they were entitled to, for the rule thus stated is limited to cases where a conviction is sought wholly [6] on circumstantial evidence, and the evidence in this case was not confined to circumstantial evidence—there was much direct and real evidence in it.

---

[5] *Com. v. Rosen,* 141 Pa. Superior Ct. 272, 276, 14 A. 2d. 833; *Com. v. Smith,* 151 Pa. Superior Ct. 113, 116-7, 30 A. 2d. 339.

[6] "The learned trial judge correctly stated thus the rule by which the probative value of circumstantial evidence is to be measured: 'When a crime charged is sought to be sustained *wholly* by circumstantial evidence, the hypothesis of guilt or delinquency should flow naturally from the facts and circumstances proved, and be consistent with them all. The evidence of facts and circumstances must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed, or in other words the facts and circumstances must ·not

The court's charge as to a criminal intent being present where the object of the conspiracy is the commission of a crime, was in accordance with our ruling in *Com. v. Kirk,* 141 Pa. Superior Ct. 123, 14 A. 2d 914, affirmed 340 Pa. 346, 17 A. 2d 195, where we said, pp. 137-138: "In the present case, the combination was proved by direct testimony of the most convincing nature. In fact, the *combination* was not seriously disputed by the defendants. They strenuously denied, however, any criminal intent or corrupt motive, or a combination to do an unlawful act. If the combination is formed for the purpose of committing a crime, ...... if there be a direct intention that a crime should be committed, whether it be a crime at common law or by statute, the corrupt motive or criminal intent is necessarily present, for there can be no innocent motive in a combination entered into to commit a crime. But if the combination is to do something unlawful, but not criminal, or to do something not itself unlawful by unlawful means, before the jury can convict of a criminal conspiracy, they must be satisfied, from all the attending circumstances, and beyond a reasonable doubt, of the criminal intent or corrupt motive of those entering into the combination, or of at least two of them, whom they convict." It was also in accord with the request for instructions made by counsel for the defendant, Sinkow, at the end of the charge, as follows: "I ask your Honor to charge on the question of intent in conspiracy, that it is necessary to find two intents, one to reach an agreement between the parties, and the other that, having reached an agreement, they must intend to commit a crime as the object of the conspiracy." This request, while not strictly accurate as applied to all charges of conspiracy, was correct as applied to this

---

only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence' ". *Com. v. Byers,* 45 Pa. Superior Ct. 37, 38.

case, for the conspiracy charged here was a combination to commit a crime, to wit, the setting up of a lottery and the sale of tickets thereof; hence the court properly answered the request by saying: "I think I did charge them on the question of intent; I said that a criminal intent is necessary, and I certainly affirm that. Criminal intent must be inherent in the agreement, there is no doubt about that, and in the commission of the crime. I affirm the oral point that you have just submitted, in other words."

All of the cases relied upon by the appellants in respect to this part of the charge, related to conspiracy to commit crimes, which crimes required a *fraudulent* or evil intent on the part of the defendant to be shown in order to sustain a conviction, and hence the fraudulent intent had to be proved as a part of the conspiracy. These included cases where defendants were charged with conspiracy to make false election returns (*Com. v. Gormly,* 77 Pa. Superior Ct. 298; *Com. v. Gormly,* 78 Pa. Superior Ct. 294) for an innocent mistake or error in making such a return is always possible; and cases where the defendants (county employees) were charged with conspiring to defraud the county by the illegal use of its gasoline, and the Supreme Court held that the evidence failed to support a fraudulent use and showed rather an entirely innocent use at the behest of their superiors: *Com. v. Benz,* 318 Pa. 465, 178 A. 390; *Com. v. Routley,* 318 Pa. 465, 178 A. 390. For a like fraudulent intent as a constituent of the offense, see *Com. v. Bardolph,* 314 Pa. 579, 172 A. 298, and 326 Pa. 513, 192 A. 916.

No such fraudulent intent is a necessary constituent in the conviction of a defendant for setting up a lottery or selling lottery tickets.

The court's charge as to the probative value of circumstantial evidence, as we have already pointed out, was more favorable to the defendants than they had a

right to ask, whether the rule laid down in *Com. v. Byers,* supra, referred to in note 6 above, be followed, or the modification as suggested in *Com. v. Marino,* 142 Pa. Superior Ct. 327, 333 [7]; for both of them relate to cases where the crime charged is sought to be sustained *wholly* by circumstantial evidence, which was not the case here.

As to Mittelman and Sinkow the evidence connecting them with the manufacture, possession and concealment of lottery tickets, lottery announcements or advertisements and other paraphernalia for setting up a lottery, was direct and not circumstantial. Mittelman's only defense was that he did not *know* it was a crime to take part in the manufacture, possession, etc. of the announcements intended to advertise the lottery, and of the tickets intended for sale, as part of the conduct of such lottery. We have previously noted that this is not a valid defense. Sinkow really presented no defense at all, for he was proved by his co-defendant, Mittelman, to have been the man who ordered the work done, and by his undenied admissions to the officers to have been one of the parties who carried on the lottery, sent out tickets to agents and verified the winning tickets by comparing the numbers on the tickets with the office strip to see if they were genuine and not counterfeit tickets.

There was less direct evidence to support the conviction of Saffian, but even as to him the evidence was not wholly circumstantial. In our opinion it was sufficient to take his case to the jury. His possession of tons of metal tape so cut, stamped, or processed, as to be peculiarly appropriate and necessary for the fastening or stapling of lottery tickets, and for no other use, under the evidence in the case; his shipment of this

---

[7] See also *Com. v. Libonati,* 346 Pa. 504, 31 A. 2d 95; *Com. v. Meyers,* 154 Pa. Superior Ct. 8, 11, 34 A. 2d 916, 917; *Com. v. De Petro,* 154 Pa. Superior Ct. 535, 36 A. 2d 513.

tape under an assumed name and his refusal to claim it when the consignee, under surveillance, refused to accept or receive it; the fact that this identical tape, with clearly defined marks was used in the fastening or sealing of the 'Empire' lottery tickets, which the jury could find formed a part of the one general lottery scheme; and his reply to the officers—not denied by him—as to the use to be made of the tape—the dies, etc., "You have been watching this place long enough; you should know", are consistent with his guilt and inconsistent with his innocence and were evidently sufficient to convince the jury of his guilt beyond a reasonable doubt.

The assignments of error are all overruled. The judgments are severally affirmed and the defendants are ordered to appear in the court below at such time as they may respectively be called, and that each of them be committed until he has complied with his sentence or such part thereof as had not been performed when his appeal was made a supersedeas.